**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION**

| | |
|---|---|
| **ANTHONY PASSAUER**<br><br>　　　　　　**Plaintiff,**<br><br>　**v.**<br><br>**QUEST DIAGNOSTICS INCORPORATED,**<br><br>　　　　　**Defendant.** | **Civil No.: CCB 03-CV-159** |

**MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Frank C. Morris, Jr., Esq.
Bar No. 05157
Brian Steinbach, Esq.
Bar No. 024849
EPSTEIN BECKER & GREEN, P.C.
1227 25th Street, N.W.
Washington, D.C. 20037
(202) 861-1870

Attorneys for Defendant
Quest Diagnostics Incorporated

September 23, 2003

# TABLE OF CONTENTS

I.   INTRODUCTION..................................................................................................1

II.  STATEMENT OF UNDISPUTED MATERIAL FACTS.........................................3

   A.  BACKGROUND............................................................................................3

   B.  QUEST'S ACQUISITION OF SMITHKLINE .................................................5

   C.  PLAINTIFF GOES OUT ON LEAVE .............................................................6

   D.  PLAINTIFF'S ATTEMPT TO RETURN TO WORK WHILE STILL UNDER A
       THIRTY POUND LIFTING RESTRICTION AND THE EXPIRATION OF HIS
       FMLA LEAVE ...............................................................................................8

   E.  PLAINTIFF'S SUBSEQUENT ATTEMPT TO RETURN TO WORK AND
       AFTERMATH...............................................................................................11

III. THE STANDARD FOR SUMMARY JUDGMENT.................................................13

IV.  ARGUMENT.......................................................................................................14

   A.  PLAINTIFF CANNOT ESTABLISH A VIOLATION OF THE FMLA...............14

       1.  Quest Did Not Violate the FMLA by Declining to Permit Plaintiff to Return to
           Work with a Thirty Pound Lifting Restriction.................................................15

       2.  Plaintiff's FMLA Claim is Also Barred by the Statute of Limitations.............17

   B.  PLAINTIFF'S STATE LAW CLAIMS ARE PREEMPTED BY ERISA.............19

   C.  PLAINTIFF CANNOT ESTABLISH A CLAIM OF NEGLIGENT
       MISREPRESENTATION ...............................................................................21

   D.  PLAINTIFF CANNOT ESTABLISH A CLAIM OF PROMISSORY
       ESTOPPEL/DETRIMENTAL RELIANCE .....................................................24

   E.  PLAINTIFF CANNOT ESTABLISH A BREACH OF CONTRACT CLAIM......27

   F.  PLAINTIFF CANNOT ESTABLISH A CLAIM OF FRAUD OR DECEIT.........30

V.   CONCLUSION ...................................................................................................33

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**NORTHERN DIVISION**

| | |
|---|---|
| **ANTHONY PASSAUER** | |
| **Plaintiff,** | |
| **v.** | **Civil No.: CCB 03-CV-159** |
| **QUEST DIAGNOSTICS INCORPORATED,** | |
| **Defendant.** | |

**MEMORANDUM OF LAW IN SUPPORT OF**
**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

## I.    INTRODUCTION

This case alleging a violation of the Family and Medical Leave Act ("FMLA"), 28 U.S.C. §2601, et seq., and various common law claims, arises out of the former employment relationship between Plaintiff, Anthony Passauer ("Plaintiff"), and Defendant, Quest Diagnostics Incorporated ("Quest"), which ended in May 2000.[1]

In Count I, Plaintiff alleges Quest violated the Family and Medical Leave Act ("FMLA"), 29 U.S.C. §2601, et seq., by failing to permit him to return to his former position at the end of FMLA leave. (Complaint, ¶¶ 16-24.) In Count II, "Negligent Misrepresentation," Plaintiff alleges that he was injured due to his reasonable reliance on Quest's unspecified allegedly negligently false representations. (Complaint, ¶¶ 25-29.) In Count III, "Promissory Estoppel/Detrimental Reliance," he alleges that he was injured due to his reasonable reliance on Quest's alleged assurance that upon return from FMLA leave, he would be reinstated to his former position or

---

[1] This case was originally filed in the Circuit Court for Baltimore County, Maryland on December 13, 2002, over two and one-half years after Plaintiff's employment with Quest ended. Quest timely removed the case to this Court on both federal question and diversity grounds.

that in the alternative Quest would attempt to accommodate any restrictions on his ability to perform the essential elements of his job. (Complaint, ¶¶ 30-34.) In Count IV, "Contract," Claimant alleges that he was injured by Quest allegedly breaching an employment contract with him by terminating him and not giving him his severance pay. (Complaint, ¶¶ 35-40.) Finally, in Count V, "Fraud/Deceit," Claimant alleges that he was injured by his reasonable reliance on Quest's unspecified allegedly fraudulent representations. (Complaint, ¶¶ 41-32 (sic).) For each count, Claimant seeks to recover damages in the form of lost wages and benefits, in particular lost severance pay, plus "liquidated damages," attorney fees and costs. (Complaint, "wherefore" clauses following each count.)[2] Quest denies violating the FMLA and that it is liable under any of the common law claims, and raises several affirmative defenses. (Answer.)

Quest now seeks summary judgment against Plaintiff as to each of the claims against it because the undisputed facts show that Plaintiff cannot establish his claims as a matter of law. Among other things, (1) Plaintiff cannot establish a violation of the FMLA because his ability to work was restricted at the time that he sought to return to work and Quest had no obligation to let him return to work while his ability to work was restricted, and in any event his FMLA claim is time-barred; (2) Plaintiff's common law claims are preempted by the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001, et seq.; (3) Plaintiff cannot establish one or more of the factual predicates for each of his common law claims; and (4) the doctrine of employment at will bars some or all of his common law claims. Under these circumstances, Plaintiff's claims must fail, and summary judgment should be granted in Quest's favor.

---

[2] Plaintiff also seeks punitive damages under Counts IV and V.

II.    **STATEMENT OF UNDISPUTED MATERIAL FACTS**[3]

**A. BACKGROUND**

Quest is a Delaware corporation doing business at various locations throughout the United States, including Maryland. (Complaint ¶ 2; Answer ¶ 2; Declaration of Marilyn Martin Holthaus ("Holthaus Dec.") (attached as Ex. A), ¶ 3.) At all pertinent times its main Maryland office and laboratory was located on Sulphur Spring Road in Arbutus, Maryland, and it also operated a warehouse located nearby on Caton Avenue, also in Arbutus. (Holthaus Dec. ¶ 3.) Among other things, Quest provides diagnostic testing, information and services to doctors and hospitals. In the course of providing these services, it employs drivers who pick up medical specimens from various physician offices and medical facilities and bring them to a terminal, from where the specimens are transferred to the laboratory in Arbutus. The same drivers also deliver reports and supplies. In addition, Quest operates free-standing facilities at which diagnostic services are also provided. Quest's Caton Avenue warehouse, among other things, provides supplies to both its own facilities and to the various physician offices and medical facilities for which it provides services. (Holthaus Dec. ¶ 5.)

On August 16, 1999, Quest acquired the similar operations of SmithKline Beecham Clinical Laboratories ("SmithKline"). This included a warehouse located in Owing Mills, Maryland. Actual operations were integrated over a period of time. In the Baltimore business unit, this occurred in late December 1999 and early January 2000. The Owings Mills warehouse closed during the first quarter of 2000 and most of the employees accepted

---

[3] For the purposes of its motion for summary judgment, Quest does not dispute the accuracy or admissibility of any of the facts or testimony set forth herein. However, if its motion is not granted, it reserves the right to dispute the accuracy of such facts or testimony or their admissibility in subsequent proceedings in this case, including but not limited to at trial.

transfers to the Caton Avenue warehouse. This included Facilities Supervisor Sayed (Ali) Haghgoo. (Holthaus Dec. ¶ 6.)

Plaintiff first began work for one of Quest's predecessors, Upjohn Laboratory Procedures, in Baltimore, Maryland in November 1974. (Deposition of Anthony R. Passauer, Jr. ("Dep.") (relevant excerpts attached as Ex. B) at 17:4-12.) Following a series of relocations and acquisitions, by 1999 Plaintiff was working for SmithKline in Owings Mills, Maryland. (Dep. at 17:12-19:17, 20:4-21:8, 21:21-22:18.) He initially was a driver, later became a lead service representative, and then became a supervisor over both drivers and the warehouse. (Id. at 17:10-21, 19:16-20:3, 20:17-18, 21:3-20, 22:19-23:4.) Eventually he ceased being a supervisor and was given the title of Warehouse Coordinator in the warehouse. For a period of time Plaintiff was the only warehouse employee, but eventually he supervised two people and temporary employees whose numbers fluctuated. (Id. at 21:15-20, 23:5-15, 32:19-33:4.) In his last few years at Owings Mills he reported to Facilities Supervisor Sayed (Ali) Haghgoo. (Dep. at 25:9-14; Declaration of Sayed (Ali) Haghgoo ("Haghgoo Dec.") (attached as Ex. C), ¶ 3.)

As Warehouse Coordinator, Plaintiff ordered supplies by entering orders into a computer, and also printed out orders from various clients. (Dep. at 26:8-13, 27:16-28:12; Haghgoo Dec. ¶ 3.) After completing his ordering tasks, he would then go to the warehouse itself and help others get the items, box them, tape up the box, and place the box on the loading dock. (Haghgoo Dec. ¶ 3.) In the latter part of the day he worked on restocking, especially as new stock came in to the warehouse. (Haghgoo Dec. ¶ 3.) When new stock arrived, he checked the order; moved the goods from the dock where the driver left them; and shelved the items. (Dep. at 30:1-32:18). He also performed a significant amount of facilities

maintenance, not only in the warehouse, but also at the company's various other facilities. (Dep. at 26:22-27:12, 34:7-11; Haghgoo Dec. ¶ 3.) Although he used a forklift truck as needed and a hand truck, there was constant lifting. (Dep. at 31:3-5; Haghgoo Dec. ¶ 3.) Every day there were many boxes of paper to move. (Haghgoo Dec. ¶ 3.)

### B.  QUEST'S ACQUISITION OF SMITHKLINE

In early 1999, it was announced that Quest would be purchasing the SmithKline operation. (Dep. at 35:19-36:3.) The actual purchase occurred in August 1999. (Id. at 22:14-18, 37:16-18; Holthaus Dec. ¶ 6.) After completion of the sale, Plaintiff learned that the building in which he was located eventually would close. (Id. at 36:4-19.) He also received a Quest Benefits Handbook and a summary of benefits. (Id. at 37:19-40:8 and Dep. Exs. 4-5.) He met Larry Bauernshub, who was then the manager of Quest's warehouse, located on Caton Avenue in Arbutus, Maryland, and who also began overseeing the Owings Mills warehouse operations. (Id. at 37:6-15, 41:19-42:3; Haghgoo Dec. ¶ 2.)

Among the benefits provided by Quest was a Severance Plan. This Severance Plan provided severance pay and continuation of health benefits to employees involuntarily terminated without cause under certain specific circumstances, such as reductions in force, facility closings, reorganizations or consolidations. Among the specific exclusions from coverage were situations in which an employee terminates following a leave of absence beyond the period of FMLA leave. (Dep. Ex. 4, "Other Benefits" at 6-7 (P-358-359); Dep. Ex. 5 at 5 (P-364); Holthaus Dec. ¶7 and Ex. 1 at §§ 3.1, 3.3(h), 3.6.) This Severance Plan is considered a "welfare plan" under ERISA. (Dep. Ex. 4, "Administration" at 2-5 (P-329-32); Holthaus Dec. ¶ 7 and Ex. 1 at §6.5.) Under the Severance Plan, there are specific

requirements for applying for benefits, for appealing a denied claim, and for filing suit. (Dep. Ex. 4, "Other Benefits" at 7 (P-359); <u>Id.</u>, "Administration" at 2-03 (P329-30); Holthaus Dec. ¶ 7 and Ex. 1 at §§ 4.3, 4.4.)

### C.  PLAINTIFF GOES OUT ON LEAVE

In February 1998 Plaintiff was involved in a car accident in which he suffered injuries to his eye and shoulder, in particular the rotator cuff, in which he lost a lot of mobility and strength. (Dep. at 11:7-9, 35:1-18, 42:13-43:2) He initially only missed a week of work. (<u>Id.</u> at 35:4.) During the next year and one-half, his doctor attempted to treat the shoulder with cortisone shots. (<u>Id.</u> at 43:3-8.) However, in October 1999 his doctor told him that he would have to have surgery to repair the damage. (<u>Id.</u> at 42:9-21, 43:8-11.) Soon thereafter, the doctor picked the date of January 18, 2000 for the surgery. (Id at 44:4-8.) This was something that Plaintiff had to have done. (<u>Id.</u> at 20-21.)

Upon learning that he needed surgery, Plaintiff informed Quest and filled out the paperwork for short-term disability. (Dep. at 44:9-17.) Although he did not request FMLA leave, Quest told him that it would be treated as such, and started his FMLA leave on the day of his surgery, January 18, 2000. (<u>Id.</u> at 44:13-45:1). On January 19, 2000, Plaintiff received a letter from Quest, dated January 17, 2000 and signed by Mindy McNey, a Quest Human Resources Representative, which explained the terms of his leave in detail. (<u>Id.</u> at 45:8-48:3 and Dep. Exs. 6 and 7; Holthaus Dec. ¶ 8 and Ex. 2.) Among other things, this letter stated:

**Amount of Leave**

As of this date, the maximum leave available for you is 12 weeks.

* * * * *

**This is to inform you that:**

1.    The Company has tentatively designated your absence as FMLA leave. The leave starts on 01/18/2000 and continues until your health care provider releases you to return to work. (Maximum leave entitlement is twelve (12) weeks within a 12-month period.)

If you have applied for disability benefits under the Company's disability program and have received written notification from Aetna that your disability has been certified, you do not need to do anything further at this time regarding obtaining a Provider's Certification.

* * * * *

7. You will be required to present a fitness for duty certificate prior to being restored to employment. If such certification is not received, your return to work may be delayed until the certification is provided. A fitness-for duty certificate is a note from your health care provider or Aetna confirming that the condition set forth in the Provider's certification, or the condition reported to Aetna, has ended, and that you are able to return to work and perform the functions of your position.

8. If the fitness-for-duty certification sets out any restrictions on your ability to perform the essential functions of your job, the Company will consider it a request for temporary accommodation and will work with you in an effort to accommodate you. Where your restrictions cannot be accommodated, the Company will consider other options, including requiring you to take additional leave or another open position.

* * * * *

10. If you do not report back to work on or before your expiration date or your release to return to work, if you accept other employment during your leave, participate in a personal business venture, file for unemployment benefits during this leave, or otherwise indicate that you will not return, the Company has a right to terminate you employment.

(Dep. Ex. 6 at P-147-49; Dep. Ex. 7 at pp. 1-3.)

Plaintiff admits that he was aware (1) that he had to return within 12 weeks in order to have a guarantee of his job, (2) that he would need a fitness for duty certificate from his doctor before he could come back to work, and (3) that this was in the letter. (Dep. at 48:8-11, 50:15-51:10.) He agrees that paragraph 8 stated that if there were any restrictions, Quest would consider it a request for temporary accommodation and would work in an effort to accommodate him, and that if the restriction could not be accommodated, it would look at other

7

options. He agrees that there was no promise that he would have a job if he could not come back to work within the 12 weeks. (Dep. 50:12-51:2.)

As noted above, Plaintiff's leave began on Tuesday, January 18, 2000. Thus, the last day of his maximum twelve weeks of leave was Monday, April 10, 2000. He would have taken the leave whether or not Quest had given him FMLA leave. (Dep. 42:4-6; 100:13-19.) While on leave, Passauer received short-term disability benefits from Aetna of about $429.00 every two weeks; in addition, he was able to use regular leave for the difference between his disability payments and his regular rate of pay. (Dep. 49:4-50:14.)[4] The cost of his medical care was covered by his company medical insurance. (Dep. 54:13-16.) He stayed in touch with Mr. Haghgoo, and was aware that during that time period the Owings Mills warehouse was closing down and moving to Arbutus. (Dep. 52:20-53:11; 59:3-60:5.) By April 1, 2000, all of the work formerly done at the Owings Mills facility had been transferred to the Caton Avenue facility, along with essentially all the employees. (Haghgoo Dec. ¶¶ 2, 4.)

### D. PLAINTIFF'S ATTEMPT TO RETURN TO WORK WHILE STILL UNDER A THIRTY POUND LIFTING RESTRICTION AND THE EXPIRATION OF HIS FMLA LEAVE

On April 3, 2000, Plaintiff's doctor gave him a limited release, entitled "Disability Certificate." (Dep. 54:17-55:8 and Dep. Ex. 8.) This certificate first stated that Plaintiff was totally incapacitated from April 3 to April 9, 2000, and was not to work through those dates. It then stated: "Return to work 4-10-00. No lifting over 30 pounds until 5-1-00." (Dep. Ex. 8.) On April 5, 2000 Plaintiff took this certificate to Quest's Human Resource department on Sulphur

---

[4] As stated in the Benefits Handbook and the summary of benefits, Quest provided short term disability coverage for non-work related absences at no cost to the employee. Non-exempt employees such as Plaintiff received 60% of weekly pay up to a maximum benefit of $1000.00 per week for up to 26 weeks. See Dep. Ex. 4, "Salary Protection" at 4-5 (P-321-322); Dep. Ex. 5 at 3 (P-362).

Spring Road in Arbutus, where one of the women, probably Marilyn Martin, who was then a Quest Human Resources Generalist, made a copy. (Dep. 55:20-58:6, 60:6-16; Holthaus Dec. ¶ 9 and Ex. 3)[5]

After receiving the release, Ms. Martin conferred with her superior, then-Director of Human Resources Lynn Neidenbach, who in turn contacted Warehouse Manger Larry Bauernshub and asked him if he could accommodate the restriction. (Holthaus Dec. ¶ 10; Declaration of Lynn Neidenbach ("Neidenbach Dec.") (attached as Ex. D), ¶ 2.)[6]

Mr. Bauernshub had met Plaintiff (Dep. 37:6-15) and had also talked with Mr. Haghgoo about him and the work that he had performed at the Owings Mills facility. (Haghgoo Dec. ¶ 4.) He told Ms. Neidenbach that all of the jobs in the Caton Avenue warehouse, including those of the work leaders, supervisors and managers (including himself), required lifting more than thirty pounds as an essential part of the job. Accordingly, Mr. Bauernshub told Ms. Neidenbach that he did not have any work in the warehouse that could accommodate Plaintiff's lifting restriction. (Neidenbach Dec. ¶ 2.)[7]

Based on this information and her own knowledge of the physical requirements of the work in the warehouse, Ms. Neidenbach concluded that there were no jobs in the warehouse that did not involve lifting, and that a light duty restriction such as Plaintiff's could not be

---

[5] Ms. Martin has since married and changed her name to Marilyn Martin Holthaus. For consistency's sake, she is referred to herein as Marilyn Martin, although as already noted her Declaration is cited as "Holthaus Dec."

[6] Mr. Bauernshub died on September 14, 2003. (Holthaus Dec. ¶ 18 and Ex. 7.)

[7] This is consistent with Mr. Haghgoo's statement that, while at Owings Mills, Plaintiff regularly lifted heavy boxes. (Haghgoo Dec. ¶ 3.) Mr. Bauershub's decision would have been based in part on what Mr. Haghgoo told him. In addition, although not involved in the decision, Mr. Haghgoo states that based on his experience the work of the employees at the Caton Avenue warehouse regularly involved lifting more than thirty pounds. (Id., ¶ 5.) Notably, Plaintiff denied that his main job at Owings Mills entailed any lifting, but conceded that he did not know to what extent the job might have been different at Caton Avenue. (Dep. 89:16-93:9.)

accommodated even for a few weeks, as there would be nothing for the person to do. (Neidenbach Dec. ¶ 3.) Accordingly, she informed Ms. Martin that the warehouse department could not accommodate Plaintiff's restrictions, that light duty was not an option, and to so inform Plaintiff. (Neidenbach Dec. ¶ 3; Holthaus Dec. ¶ 10.)

Later on April 5, Ms. Martin called Plaintiff at home to inform him of the company's decision, and left him a message on his answering machine. (Dep. 58:7-17, 60:19; Holthaus Dec. ¶ 11.) That message stated:

> [This is?] Marilyn I'm returning your call, that you [?] talk to me. I have your doctor's note here in front of me, we have to go by what the doctor is recommending on the disability certificate and that's why we ask specifically to see that from your doctor. Um, it is indicated on here that no lifting over 30 pounds until 5/1 so those are the instructions that we have to go by. We know you are indicating that you really uh, really can work but that is not what the doctor says here and that's what we have to strictly go by.
>
> Um, so at this time, again I did check with the warehouse they are not able to accommodate that restriction. We are considering that to be, uh, light duty. We can not accommodate that. Until you can come back at full duty and be able to work with no restrictions we cannot have you return to work
>
> Please call me if you have any questions. I'm at 410-536-1448.

(See Dep. Ex. 9.)[8] Plaintiff knew that "Marilyn" was someone in Human Resources. (Dep. 64:19-65:1.) He did not, however, go back to his doctor to try to get the restriction removed right away. (Id., 65:2-4.) Ms. Martin never received any return call from Plaintiff disputing Quest's position that the 30 pound lifting restriction constituted light duty or that Quest could not accommodate that restriction. (Holthaus Dec. ¶ 12.)

---

[8] Plaintiff kept a copy of the message, and at his deposition agreed that Dep. Ex. 9 is an accurate transcription, with the understanding that there are two places where the transcription indicates that it could not be determined what was said. (Dep. 60:20-63:11 and Dep. Ex. 9.) Ms. Martin agrees that this transcript is substantially accurate. (Holthaus Dec. ¶ 11.)

Consistent with standard company practice, Ms. McNey sent Plaintiff a letter dated April 19, 2000 notifying him that his FMLA leave expired on April 11, 2000 and that he no longer had the job restoration rights provided under the FMLA. (Dep. 65:8-66; Dep. Ex. 10 at 1 (P-151); Holthaus Dec. ¶ 13.) The letter told him that he was being retained on the company system solely to ensure that any applicable benefits were maintained in accordance with company policies, e.g. his continued short term disability benefits, and how to get health insurance going forward. (Dep. Ex. 10 at 1-2 (P-151-52).) The letter ended with the following statement:

> Please contact me when you are released by your physician to return to work if you are interested in job opportunities with the Company. At such time we can discuss available positions for which you may be qualified (emphasis added).

(Dep. 66:6-22; Dep. Ex. 10 at 2 (P-152).) Plaintiff admits receiving this letter. (Dep. 81:2-8; Dep. Ex. 11 at 1 (P-001).)

## E.  PLAINTIFF'S SUBSEQUENT ATTEMPT TO RETURN TO WORK AND AFTERMATH

On or about Monday, May 8, 2003 Plaintiff went to the warehouse on Caton Avenue and attempted to return to work.[9] According to his testimony, he first met with Mr. Haghgoo, who referred him to Mr. Bauernshub. Mr. Bauernshub, in turn, told him that he did not have any work for him and that he would need to go to Human Resources. (Dep. 67:13-68:22.) He then went to the main office and met with Ms. Martin. (Dep. 70:1-8.) He told her that he was there to start work and either had, or said that he had, a new certificate without a lifting restriction. (Dep. 70:1-13; Dep. Ex. 11 at 1 (P-001); Holthaus Dec. ¶ 14.) According to his

---

[9] Plaintiff testified that he may have left a message for Ms. McNey on May 1 stating that he had a full release, and she may have called him back and told him that if they could not find anything for him, he would be terminated. (Dep. 81:9-82:2; Dep. Ex. 11.) He also testified that the actual release may have been for May 8. (Dep. 110:10-113:21.)

testimony, he said that Mr. Bauernshub had told him that he did not have anything for him, told Ms. Martin that he had been told that his job was no longer protected, and asked her if there was something that he could do. Ms. Martin confirmed that there was no job for him, but, consistent with the statement in Ms. McNey's April 19 letter that Quest would "discuss available positions for which you may be qualified," told him there was a possible job as supervisor of logistics, and that he could fill out an application. He then filled out an application and was told that somebody would contact him. (Dep. 67:3-8, 70:11-71:7, 82:16-83:6; Dep. Ex. 11 at 1-2 (P-001-002); Holthaus Dec. ¶ 14.) Although Ms. Martin did not realize it at the time, as she was not involved in the hiring process for this position, the posting period for the position had already expired on May 3, and two candidates, both of whom already worked in the logistics department and were also former SmithKline employees, already had been interviewed. (Holthaus Dec. ¶ 14.)

On May 10, 2000 Ms. Martin learned that a decision had been made to offer the position to one of the candidates already interviewed. (Holthaus Dec. ¶ 15.) That afternoon, Plaintiff called Ms. Martin concerning the position. Ms. Martin told him that someone had already been picked, although it had not formally been announced; apologized that she did not know that the posting date had expired; and informed him that his employment therefore was terminated. (Dep. 71:16-72:4; 85:14-17; Dep. Ex. 11 at 3 (P-003); Holthaus Dec. ¶ 15.)

Plaintiff did not receive any severance pay. (Complaint, ¶15; Answer, ¶15.) Under the Severance Plan, he was required to apply within ten days after notification of his termination. (Dep. Ex. 4, "Other Benefits" at 7 (P-359); Holthaus Dec. Ex. 1 at §4.3.) Plaintiff never

submitted a claim for severance pay under the Severance Plan, much less filed an appeal of a denied claim. (Holthaus Dec. ¶ 16; Neidenbach Dec. ¶ 4.)

Shortly after attempting to return to work in May 2000, Plaintiff consulted with an attorney named Anthony DiPaula. Mr. DiPaula referred him to another attorney named Stephen Awalt. (Dep. 13:12-14:3; 78:6-21.) During the period from July 11 through October 18, 2000, Mr. Awalt wrote three letters to Quest threatening to file suit, the last of which included a draft complaint with on FMLA claim and was copied to Plaintiff. (Holthaus Dec. ¶ 17 and Exs. 4, 5, and 6.) However, Mr. Awalt never filed suit on Plaintiff's behalf. (Dep. 14:4:7.)

## III.    THE STANDARD FOR SUMMARY JUDGMENT

The standards applicable to a motion for summary judgment are well established. As this Court has stated:

> Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment:
>
> > shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.
>
> The Supreme Court has clarified that this does not mean any factual dispute will defeat the motion:
>
> > By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact.
>
> Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (emphasis in original).
>
> "The party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of [its] pleading, but must set forth specific facts showing that there is a genuine issue for trial. Rivanna Trawlers

> Unlimited v. Thompson Trawlers, Inc., 840 F.2d 236, 240 (4th Cir. 1988). The court must view the facts and draw reasonable inferences in a light most favorable to the nonmoving party," Shaw v. Stroud, 13 F.3d 791, 798 (4th Cir. 1994), but it also must abide by its affirmative obligation to ensure that factually unsupported claims and defenses do not proceed to trial. Felty v. Graves-Humphreys Co., 818 F.2d 1126, 1128 (4th Cir. 1987) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986)).

Jackson v. Hartford Life and Annuity Insurance Co., 201 F. Supp. 2d 506, 509-10 (D. Md. 2002). (Blake, J.).

For the reasons set forth below, based on the undisputed facts Plaintiff lacks sufficient evidence to support any of his claims. Accordingly, Quest is entitled to judgment as a matter of law.

## IV.    ARGUMENT

### A. PLAINTIFF CANNOT ESTABLISH A VIOLATION OF THE FMLA

As noted above, in Count I Plaintiff alleges Quest violated the FMLA by failing to permit him to return to his former position at the end of his FMLA leave. There is no dispute that he was entitled to FMLA leave (although he did not request it), and that Quest granted him the full twelve weeks of leave for which he was eligible. Instead, Plaintiff asserts that Quest should have permitted him to return to work before the expiration of his twelve weeks of leave, despite the fact that his doctor's certificate barred him from lifting more than thirty pounds and despite the unavailability of any such light duty work for him to perform. Contrary to Plaintiff, Quest had no obligation to return him to work while his ability to work was limited, and therefore it did not violate the FMLA by declining to permit him to return. Moreover, Plaintiff's FMLA claim is time-barred.

### 1. Quest Did Not Violate the FMLA by Declining to Permit Plaintiff to Return to Work with a Thirty Pound Lifting Restriction

Under the FMLA, an employer is required to grant an eligible employee up to twelve weeks of leave for a serious health condition. 29 U.S.C. §2612(a)(1)(D). On return from such leave, such an employee is entitled to be restored to his former or an equivalent position. 29 U.S.C. §2614(a)(1). However, an employer is entitled to require such an employee to first provide a certification from his health care provider that the employee is able to resume work, provided the employer notifies the employee of this requirement at the time the employee gives notice of the need for the leave. 29 U.S.C. §2614(a)(4); 29 C.F.R. § 825.310(e). Furthermore, an employer may delay restoration until the employee submits the certificate. 29 C.F.R. § 825.310(f); 29 C.F.R. § 825.311(c); 29 C.F.R. § 825.312(c). Unlike the Americans with Disabilities Act ("ADA"), the FMLA contains no accommodation provision. See Rineheimer v. Cemcolift, Inc., 292 F.3d 375, 384 (3rd Cir. 2002), citing 29 C.F.R. § 825.214(b), and Tardie v. Rehabilitation Hospital, 168 F.3d 538, 544 (1st Cir. 1999). To the contrary, the FMLA regulations specifically state:

> If the employee is unable to perform an essential function of the position because of a physical or mental condition, including the continuation of a serious health condition, the employee has no right to restoration to another position under the FMLA.

29 C.F.R. § 825.214(b). Accordingly, an employee unable to perform the duties of a position because of a physical condition has no right to restoration to his previous or any other position. See Reynolds v. Phillips & Temro Industries, Inc., 195 F.3d 411 414 (8th Cir. 1999); Tardie v. Rehabilitation Hosp. of Rhode Island, 168 F.3d at 544; Jewell v. Reid's Confectionary Co., 172 F. Supp. 2d 212, 220 (D. Me. 2001); 29 C.F.R. § 825.214(b).

As set forth in detail above, at the time Plaintiff began his FMLA leave he was specifically notified that his return would be conditioned on providing a fitness for duty certification. He admits that he knew he had to return within 12 weeks in order to have a guarantee of his job and that he needed such a certification before he could come back to work. When Plaintiff first attempted to return to work on April 5 (to start on April 10), 2000, prior to the expiration of his twelve weeks of FMLA leave, the doctor's certification that he presented contained a limitation that he was not to lift more than thirty pounds until May 1, 2000. It is undisputed that Quest's Human Resource department determined, based on input from the Warehouse Manager and its own knowledge of warehouse operations, that this limitation meant that Plaintiff could not perform the duties of his position. Although it had no duty under the FMLA to do so, it also determined that it could not accommodate him in a light duty position. As Ms. Martin told Plaintiff:

> Um, so at this time, again I did check with the warehouse they are not able to accommodate that restriction. We are considering that to be, uh, light duty. We can not accommodate that. Until you can come back at full duty and be able to work with no restrictions we cannot have you return to work.

It is further undisputed that Plaintiff never made any attempt to obtain a different certificate without the work restriction. He also did not dispute Quest's position that the 30 pound lifting restriction constituted light duty or that the company could not accommodate that restriction.

Accordingly, Quest properly declined to return Plaintiff to work on April 10. Furthermore, as Plaintiff did not return to work by April 11, the day after his twelve weeks of FMLA leave expired, he then lost the job restoration rights guaranteed by the FMLA. Therefore, Quest did not violate the FMLA by thereafter informing Plaintiff that he had lost his job restoration rights (Dep. Ex. 10), and by subsequently declining to restore him to his former position or provide

him with any other position. Indeed, as already noted Plaintiff admits that there was no promise that he would have a job if he could not come back to work within the 12 weeks. Therefore, Plaintiff cannot establish that Quest violated the FMLA.

### 2. Plaintiff's FMLA Claim is Also Barred by the Statute of Limitations

Moreover, even assuming, solely for the purposes of argument, that Quest had an obligation under the FMLA to permit Plaintiff to return to work on April 10 despite his inability to lift more than thirty pounds, Plaintiff's FMLA claim is time-barred. Under the FMLA's statute of limitations, an employee must bring suit in federal court to enforce his rights within two years of the disputed employment action, or no later than three years after a "willful violation" of the FMLA. 29 U.S.C. § 2617(c); Rockwell v. Mack Trucks, Inc., 8 F. Supp. 2d 499, 502 (D. Md. 1998) (Legg, J.) For a violation to be willful, the employer must have known its conduct to be wrong or have shown reckless disregard for the matter in light of the statute. McLaughlin v. Richland Shoe Co., 486 U.S. 128, 133 (1988); Sampson v. Citibank, F.S.B., 53 F. Supp. 2d 12, 19 (D.D.C. 1999).

Plaintiff's Complaint alleges that the refusal to allow him to return to work occurred in April 2000, or at the latest May 2000, and that he was "essentially fired" by the first week of May 2000. (Complaint, ¶¶ 9-14.) Construing the facts in the light most favorable to the Plaintiff, the latest possible relevant date is May 10, 2000, when Ms. Martin informed him that the Logistics Supervisor position was already filled. However, it is undisputed that Plaintiff did not file his Complaint until December 13, 2002, over two and one-half years later. Thus, he failed to meet the two-year statutory period for filing a claim under the FMLA and his FMLA claim is time-barred.

Nothing in the Complaint suggests the occurrence of any "willful violation" of the FMLA that would warrant the application of the three-year period. Indeed, Plaintiff nowhere alleges that Quest's alleges FMLA violation was willful, an absence that alone is sufficient to reject application of the three-year period. See, e.g., Moore v. Payless Shoe Source, Inc., 139 F.3d 1210, 1213-14 (8th Cir. 1998) (affirming district court dismissal of FMLA claim as time barred because complaint was filed more than two years after the alleged violation and did not allege a willful violation); Sampson v. Citibank, F.S.B., 53 F. Supp. 2d at 19 (dismissing FMLA claim on basis that, among other things, complaint failed to allege willfulness); Barnes v. Montgomery County Department of Health, No. AW-99-754, at 5-6 (D. Md. Dec. 1, 1999) (Williams, J.) (Loislaw.com. Federal District Court Opinions) (copy of printout attached as Exhibit E) (same).

In addition, there is no evidence to suggest that Quest either knew its conduct to be wrong or showed reckless disregard for the matter in light of the statute. To the contrary, the undisputed record shows that the Human Resources personnel involved (Ms. Neidenbach and Ms. Martin) evaluated the restriction contained in the certification Plaintiff presented and based on the information provided them by the Warehouse Manager (Mr. Bauernshub) and their own knowledge made a good faith decision that this restriction could not be accommodated. Even assuming, for the purposes of argument only, that this conclusion was wrong and Plaintiff could have performed his job without lifting thirty pounds, there is nothing to suggest that they had any reason to believe otherwise. To the contrary, Mr. Haghgoo's corroboration of Mr. Bauernshub's statement to Ms. Neidenbach (Haghgoo Dec. ¶ 6) reinforces the validity of her reliance on that statement. Therefore, Plaintiff cannot show that they acted with reckless

disregard, much less with the knowledge that their actions were wrong. Sampson v. Citibank, F.S.B., 53 F. Supp. 2d at 19 (also dismissing FMLA claim on alternative ground that there was no evidence of willfulness); Hoffman v. Professional Med Team, No. 1:01-CV-3, 2003 WL 21649575 at 5-7, 2003 U.S. Dist. LEXIS 11913 at *24-29 (Conclusions of Law, part II) (W.D. Mich. June 5, 2003) (copy of Westlaw printout attached as Ex. F) (no willful violation where plaintiff presented no evidence that employer knew its conduct to be wrong).[10]

Finally, Plaintiff has no basis for any equitable tolling of the statute of limitations. As discussed above, shortly after his termination he consulted an attorney, who then sent three demand letters to Quest raising FMLA claims during the period from July 11 through October 18, 2000. The last of these included a draft complaint with an FMLA claim and was copied to Plaintiff. Thus, he was well aware of his possible FMLA claim and simply failed to take the next step of filing a complaint until after the statute had run. As he knew of a possible claim and how to present it, he cannot claim that he should be relieved from the effects of the statute of limitations.

Accordingly, summary judgment should be granted in favor of Quest on Plaintiff's Count One FMLA claim.

### B. PLAINTIFF'S STATE LAW CLAIMS ARE PREEMPTED BY ERISA

As noted above, Plaintiff brings four separate common law claims: negligent misrepresentation (Count II), promissory estoppel/detrimental reliance (Count III), contract (Count IV) and fraud (Contract V). In each of these claims, the main thrust is that he lost his

---

[10] There also is no evidence that Quest treated Plaintiff differently than anyone else. Plaintiff admitted that he is unaware of anyone else at Quest who was ever in a situation like his, trying to come back from FMLA leave with a lifting restriction. (Dep. 87:11-15.)

opportunity to receive severance pay when he was denied a chance to return to work, and on each of these claims he seeks to recover his lost severance pay. As such, these claims are preempted by ERISA.

Section 514(a) of ERISA preempts "any and all State law insofar as they may now or hereafter relate to any employee benefit plan." 29 U.S.C. § 1144(a). As this Court has acknowledged, the "Supreme Court has held that the phrase "relates to" is "expansive" and "broad." Meyer v. Berkshire Life Insurance Co., 128 F. Supp. 2d 831, 835 (Md. 2001) (Blake, J.) (citations omitted). ERISA preemption includes claims for breach of contract, fraud, unjust enrichment, breach of fiduciary duty, and negligence. Id., citing Elmore v. Cone Mills Corp., 23 F.3d 855, 863 (4th Cir. 1994). "Thus, in appropriate circumstance, state common law claims fall within the category of state laws subject to ERISA preemption." Griggs v. E.I. Dupont DeNemours & Co., 237 F.3d 371, 378 (4th Cir. 2001) (citations omitted).

As discussed above, Quest's Severance Plan is an ERISA plan. Furthermore, each of Plaintiff's common law claims relate to the Severance Plan, as each involves the question of whether or not he should have been entitled to severance under the circumstances of his case. As such, consideration of each claim would require interpretation of the Severance Plan, in particular the requirements for eligibility to receive severance pay, the requirements for applying to receive it, the conditions under which severance pay could be denied, and the degree of discretion, if any, vested in the Plan Administrator. Each claim would also require consideration of whether Quest was trying to avoid its ERISA obligations. Thus, ERISA preempts these claims and they should be dismissed.

Furthermore, even if Plaintiff's four common law claims for Severance Plan benefits were recast as a single ERISA claim, it still would fail. As discussed above, it is undisputed that Plaintiff failed to fulfill the threshold requirement of submitting a timely claim for benefits, and never filed an appeal of any alleged denial of benefits. In addition, under the terms of the Plan he clearly did not qualify for benefits, as he terminated following of leave of absence beyond the period of an FMLA leave. Thus, there is no reason to treat his common law claims as an ERISA claim. Instead, they should all be dismissed.

## C. PLAINTIFF CANNOT ESTABLISH A CLAIM OF NEGLIGENT MISREPRESENTATION

In Count II, Plaintiff alleges negligent representation. Plaintiff's Complaint contains only conclusory allegations concerning the nature of this claim. However, in his deposition, Plaintiff stated that he bases this claim on two allegedly false representations on which he relied: (1) those made to him in Ms. Martin's phone message of April 5, 2000, which he asserts led him to believe that there would be a job for him when he did have a full release; and (2) the January 17, 2000 letter and the benefit policies, which he admitted were really just a statement that "we will work with you." (Dep. 89:12-92:9, 92:17-20.) None of this is sufficient to establish a claim of negligent misrepresentation.

As this Court has noted, the Maryland Court of Appeals has outlined the elements of a claim for negligent misrepresentation as follows:

(1) the defendant, owing a duty of care to the plaintiff, negligently asserts a false statement;

(2) the defendant intends that that his statement will be acted upon by the plaintiff;

(3) the defendant has knowledge that the plaintiff will probably rely on the statement, which, if erroneous, will cause loss or injury;

(4) the plaintiff, justifiably, takes action in reliance on the statement; and

(5) the plaintiff suffers damage proximately caused by the defendant's negligence.

Hale Trucks of Maryland v. Volvo Trucks North America, 224 F. Supp. 2d 1010, 1031 (D. Md. 2002) (Blake, J.), quoting Martens Chevrolet, Inc. v. Seney, 292 Md. 328, 337-38, 439 A.2d 534, 539 (Md. 1982). Based on the undisputed facts, Plaintiff cannot meet these requirements.

First, there is no evidence that Ms. Martin said anything that was false, much less negligently false. In her message, set forth in its entirety above, she stated that Quest had to go by the doctor's certification; that this certification contained a thirty pound lifting restriction on Plaintiff; that she had checked with the warehouse and they were not able to accommodate this restriction; and that this was light duty which Quest was not able to accommodate. Finally, she stated, "until you can come back at full duty and be able to work with no restrictions we cannot have you return to work." There is no evidence that any of these statements were false. Even assuming, for the sake of argument only, that Plaintiff's claim that his job did not require lifting thirty pounds is correct, it is undisputed that Warehouse Manager Bauernshub informed Director of Human Resources Neidenbach that he could not accommodate this restriction. Thus, Ms. Martin's statement that this is what the warehouse said cannot be disputed.

Furthermore, the fact that Human Resources made such an inquiry by itself means that it did not act negligently in concluding that Quest could not accommodate the lifting restriction and in so informing Plaintiff. Indeed, the only basis that Claimant could state as to why Ms. Martin should have believed that the phone message was false was that "as a human resources representative, part of the job is to communicate to the employees about things."

22

(Dep. 93:10-94:6.) It is undisputed, however, that this is exactly what she did. Her good faith belief in the truth of what Warehouse Manager Bauernshub told the Human Resources department cannot be the basis of a claim of negligent misrepresentation.

Second, even assuming, solely for the purposes of argument, that something in Ms. Martin's statement was negligently false, Plaintiff cannot establish detrimental reliance. Plaintiff's testimony that he was somehow led to believe that when he did get his clearance he would return to work not only was something that he admittedly heard only "in my mind" (see Dep. 93:17-20), but also is without any basis in her statement. Thus, Ms. Martin said only that he could not come back to work until he could do so without restrictions – not that there would be a position for him when he no longer had such restrictions. Furthermore, any reliance that he might have placed on such an alleged statement could not have harmed him: Quest had already decided not to let him return until he had a full release, and he did not obtain a full release until a month later, after he had lost his FMLA protected right to return to work. Even if Ms. Martin had told him what he apparently alleges was the truth, i.e. that there would be no job for him after April 11 and that no effort would be made to find him another position, he still would have been in the same position.

Third, neither the January 17 letter nor the benefit policies can form the basis of a claim of negligent misrepresentation. As Plaintiff concedes, he saw the statements in these documents as essentially a promise to "work with him" if he was not able to return. Nothing in them guaranteed him a job; to the contrary, they both make it clear that return to work is conditioned on full medical clearance or the ability to accommodate a restriction, and Plaintiff admittedly was aware of this. As already discussed, it is undisputed that Plaintiff did not have

full medical clearance, and that Quest determined that it could not accommodate his restriction. Thus, he cannot show any misrepresentation, and certainly cannot establish any negligence in this regard. Further, for the reasons already stated with respect to Ms. Martin's statements, he cannot establish any detrimental reliance on either the January 17 letter or the benefit policies. To the contrary, it is undisputed — indeed Plaintiff affirmatively conceded (see, e.g., Dep. 100:13-19) — that he would have taken leave even if Quest had not offered FMLA leave.

Finally, there is no basis for finding that Quest owed Plaintiff any special duty of care. Where, as here, the parties have established a contractual relationship (even if it is only at will), special circumstances are required to add tort duties of care to those duties imposed by their contract. Martin Marietta v. International Telecommunications Satellite Org., 991 F.2d 94, 98 (4th Cir. 1992), rev'g on other grounds 763 F. Supp. 1327 (D. Md. 1991) (Garbis, J.); McNierney v. McGraw-Hill, Inc., 919 F. Supp. 853, 862 (D. Md. 1995) (Garbis, J.). There is no evidence to support the existence of any such special circumstances here.

Accordingly, Plaintiff cannot establish a claim of negligent misrepresentation, and Quest should be granted summary judgment in its favor on Count II.

### D.  PLAINTIFF CANNOT ESTABLISH A CLAIM OF PROMISSORY ESTOPPEL/DETRIMENTAL RELIANCE

Plaintiff bases his promissory estoppel/detrimental reliance claim in Count III upon allegations that he took "a leave of absence to undertake treatment for his serious health condition" in reasonable reliance upon alleged assurances that on return from FMLA leave "he would be reinstated to his same or similar job, or in the alternative that Defendant would attempt to accommodate any restrictions on Plaintiff's ability to perform the essential functions

24

of his job." (Complaint, ¶¶ 31-34). The undisputed facts show that he cannot establish such a claim.

In Maryland, a plaintiff alleging promissory estoppel, also known as detrimental reliance, must allege and prove

1. a clear and definite promise;

2. where the promisor has a reasonable expectation that the offer will induce action or forbearance on the part of the promisee;

3. which does induce actual and reasonable action or forbearance by the promisee; and

4. causes a detriment which can only be avoided by the enforcement of the promise.

Pavel Enterprises, Inc. v. A.S. Johnson, Inc., 342 Md. 143, 166 (D. Md. 1996), quoted in McDermott v. National Shipping Co. of Saudi Arabia, No. Civ. CCB-99-3080, 2000 WL 218377 at *3-4 (D. Md. Jan. 24, 2000) (Blake, J.), aff'd No. 00-2358, 2001 WL 1023207 (4th Cir. Sept. 7, 2001) (unpublished) (copies of Westlaw printouts of both attached as Ex. G). Furthermore, a detrimental reliance claim may not be available for an employee challenging the termination of his employment contract. McDermott, 2000 WL 218377 at *4, citing Adler v. American Standard Corp., 538 F. Supp. 572, 581 (D. Md. 1982).

Most importantly, Plaintiff cannot show that he relied upon the alleged assurance of reinstatement. To the contrary, Plaintiff has admitted that his decision to take leave and to undergo surgery had nothing whatsoever to do with any promises by Quest concerning what would happen when he sought to return to work. As discussed above, he testified that it was the doctor who told him he needed surgery and picked the date; that this was something that he had to have done; that he did not request FMLA leave; and that he did not recall if he

received Quest's letter of January 17, 2000 before or after he started his leave on the day he had surgery, January 18. (Dep. 42:9-21, 43:8-11 44:4-8, 44:13-45:1, 45:8-47:17). In fact, he received the letter on January 19, <u>after</u> he began his leave and after his surgery. (Dep. Ex. 7; Holthaus Dec. ¶ and Ex. 2.) He also admitted that he would have taken leave for surgery whether nor not he had been given FMLA leave. (Dep. 100:13-19.) Thus, it is undisputed that Plaintiff did not rely on any assurances from Quest in deciding to take his leave of absence.

In addition, there is no evidence of a "clear and definite promise" of reinstatement or accommodation. To the contrary, the January 17 letter made it clear that job restoration was conditioned on a doctor's certification that contained no restrictions, that if there were restrictions Quest would merely "work with you in an effort to accommodate you," and that if the restriction could not be accommodated, Quest would consider other options. At best, this is only a promise to accommodate <u>if possible</u>. Plaintiff admits that he was aware of these limitations and that there was no promise of a job if he could not come back to work within 12 weeks. Furthermore, as already discussed above, the evidence shows that Quest did fulfill these provisions of the January 17 letter. Thus, faced with a certification that contained restrictions, it attempted to accommodate, but determined that it could not do so, and then required the other option of continued leave. Thus, the detriment that Plaintiff claims to have suffered – loss of his job and the resulting loss of his severance –occurred despite Quest's fulfillment of its alleged promises.

Finally, recognition of Plaintiff's garden-variety detrimental reliance claims would, like the claims raised in <u>McDermott</u>, virtually swallow the general rule in Maryland favoring employment at will. As this court noted in <u>McDermott</u>, Maryland has resisted attempts to

circumvent the employment at will doctrine by reliance on theories such as estoppel. Because Plaintiff's employment was at will, he could not reasonably rely on Quest's alleged statement of intent to retain him. See McNierney v. McGraw-Hill, Inc., 919 F. Supp. at 861 and cases cited therein.

Accordingly, Plaintiff cannot establish a claim of promissory estoppel/detrimental reliance, and judgment should be entered in Quest's favor on Count III as well.

### E.  PLAINTIFF CANNOT ESTABLISH A BREACH OF CONTRACT CLAIM

In Count IV, Claimant alleges Quest breached a contract in bad faith by terminating him and not paying him severance pay. (Complaint, ¶¶ 35-40.) He bases his contract claim on the Benefits Handbook (Dep. Ex. 4) and the January 17 letter (Dep. Ex. 7). In particular, he alleges that Quest did not honor an alleged promise to either offer him a job or give him his severance or other pay and benefits. (Dep. 96:2-21). He admits, however, that he has no factual basis for his allegations (Complaint ¶ 40) that Quest acted in bad faith and in order to terminate him and not have to pay severance. (Dep. 97:4-98:6.) As discussed below, Plaintiff's breach of contract claim has no substance.

In order to establish a breach of contract claim, a plaintiff must establish both the existence of a contractual obligation and a material breach of that obligation. Taylor v. Nationsbank, N.A., 365 Md. 166, 175, 776 A.2d 645 (2001); Continental Masonry Co. v. Verdel Constr. Co., 279 Md. 476, 480, 369 A.2d 566, 569 (1977). As already noted above, Maryland continues to follow the long standing common law rule that an employment contract of indefinite duration, such as Plaintiff's with Quest, is "at will" and normally can be terminated legally at the pleasure of either party at any time. Adler v. American Standard Corp., 538 F.

Supp. at 581 (D. Md. 1982); <u>Adler v. American Standard Corp.</u>, 291 Md. 31, 35, 432 A.2d 464, 467 (1981); <u>accord</u>, <u>McDermott v. Nat. Shipping Co. of Saudi Arabia</u>, 2001 WL 218377 at * 4. Thus, Quest presumptively was free to terminate Plaintiff at any time so long as in doing so it did not violate some other statute (such as the laws against employment discrimination or the FMLA).

As already noted, Plaintiff nonetheless contends that the Benefits Handbook (Dep. Ex. 4) and the January 17 letter (Dep. Ex. 7) constituted promises of specific terms and benefits of employment in consideration for which he worked for Quest and took a leave of absence under the FMLA, and that Quest breached this alleged employment contract by firing him and not giving him severance. Neither the facts nor the law support his contentions.

As an initial matter, there is no language in either the Benefits Handbook or the January 17 letter that in any way changed Plaintiff's employment at will status. Thus, Quest was free to terminate Plaintiff at any time. At most, it would only be required to grant Plaintiff the benefits stated in the Benefits Handbook while he was employed, and even then only until such time as these were changed.

Secondly, as already discussed above, Plaintiff admits that he took his leave of absence without regard to whether or not it was covered by the FMLA; indeed, he testified that he had to take the leave and would have done so regardless. Therefore, he cannot claim that he took leave under the FMLA in exchange for the alleged promises in the Benefits Handbook or the January 17 letter – which he did not even receive until <u>after</u> he had begun his leave of absence.

28

Furthermore, even assuming, for the purposes of argument only, that the statements in these two documents concerning Quest's FMLA policies or its Severance Plan somehow constituted contractual agreements with Plaintiff, he cannot show that Quest in any way breached these alleged agreements. As discussed in detail above, both the statement of FMLA policies in the Benefits Handbook and the January 17 letter made it very clear that job restoration rights were contingent on returning to work on or before the expiration of a maximum of twelve weeks of FMLA leave. They also made it very clear that that in order to return to work, Plaintiff must have a fitness for duty certificate from his physician; that if this set out any restrictions on his ability to perform his job, it would be considered a request for temporary accommodation and Quest would attempt to accommodate him; but that if his restriction could not be accommodated, Quest would consider other options, including requiring him to take additional leave. Plaintiff admits that he was aware of these conditions and that the January 17 letter contained no promise that he would have a job if he could not come back to work within the 12 weeks.

This is, of course, exactly what happened: Plaintiff presented a certificate that contained a restriction on his ability to perform his job, Quest determined that it could not accommodate him, and Quest then required him to take additional leave. The fact that this additional leave took him beyond the period in which his job was protected in no way constitutes evidence that Quest breached its FMLA policies as stated in the Benefits Handbook or the January 17 letter.

Similarly, the description of the Severance Plan contained in the Benefits Handbook specifically stated that he would not be covered if he terminated his employment following a leave of absence beyond the period of the FMLA. Thus, Quest cannot be found to have

breached any alleged promise to give Plaintiff severance pay by failing to do so when his termination occurred for this reason, a circumstance that under the Severance Plan specifically disqualified him from receiving severance pay. Moreover, the statement of the Severance Plan in the Benefits Handbook specifically advised Claimant that in order to obtain benefits, he must file a claim within 10 days of the notification of his termination. There is no evidence Plaintiff <u>ever</u> filed such a claim, much less that he did so within the required 10 days. He also never filed an appeal of any alleged denial of severance benefits. Whether or not such a claim would have been accepted, his failure to fulfill the condition precedent of filing a claim bars him from showing that Quest breached any contract by failing to pay it.

Accordingly, Plaintiff's breach of contract claim in Count IV also must fail.

### F.  PLAINTIFF CANNOT ESTABLISH A CLAIM OF FRAUD OR DECEIT

Finally, in Count V, Plaintiff purports to state a claim of fraud. In his Complaint, Plaintiff made only a general allegation that Quest "made numerous, knowingly false representations (lies) to Plaintiff with the intent to defraud and injure Plaintiff, and to never follow through on their promises." (Complaint, ¶ 42.) However, in his deposition he testified that the main alleged false representations upon which he relies are the same as in his contract claim, i.e. the alleged promises in the Benefits Handbook and the January 17 letter that Quest would offer him a job or provide him with severance. He also testified that he relies on a claim that he was led to believe he would be interviewed for the job for which he applied in May 2000. (Dep. 90:14-91:12.) For the reasons stated below, this claim also fails.

Under Maryland law, a claim for fraud or deceit requires proof:

(1) that the defendant made a false representation to the plaintiff, (2) that its falsity was either known to the defendant or that the representation was made

30

> with reckless indifference as to its truth, (3) that the misrepresentation was made for the purpose of defrauding the plaintiff, (4) that the plaintiff relied on the misrepresentation and had the right to rely on it, and (5) that the plaintiff suffered compensable injury resulting from the misrepresentation.

Hale Trucks of Maryland, 224 F. Supp. 2d at 1031, quoting Alleco v. Harry & Jeanette Weinberg Foundation, Inc., 340 Md. 176, 195, 665 A.2d 1038, 1047-48 (Md. 1995). A plaintiff must prove each element of a claim of fraud by clear and convincing evidence. See, e.g., Everett v. Baltimore Gas & Elec., 307 Md. 286, 300, 513 A.2d 882, 890 (1986). Furthermore:

> Ordinarily fraud cannot be predicated on statements which are promissory in their nature, and therefore an action for deceit will not lie for the unfulfillment of promises or the failure of future events to materialize as predicated.

Hale Trucks of Maryland, 224 F. Supp. 2d at 1032, quoting Alleco, 340 Md. at 196, 665 A.2d at 1048 (quoting Appel v. Hupfield, 199 Md. 374, 379, 84 A.2d 94, 96 (Md. 1951)).

With respect to the Severance Plan, Plaintiff cannot show any false representation of fact. To the contrary, it is undisputed that the Severance Plan explicitly stated that an employee such as Plaintiff who is terminated following a leave of absence beyond the period of the FMLA was not eligible to receive severance. Plaintiff also lacks any evidence that Quest knew any statement about the Severance Plan was false, or made false statements with intent to defraud. Furthermore, as noted above Plaintiff's failure to even apply for severance bars him from complaining that he did not receive it. Consequently, he also cannot show detrimental reliance on anything in the statements about the Plan.

With respect to the other alleged promises contained in Quest's FMLA policies and the January 17 letter, Plaintiff's effort to construct a fraud claim fails on several counts. First, as already discussed above, there is no evidence that any of the statements made concerning Quest's FMLA policies were false. To the contrary, as previously noted, Quest did exactly what

it promised: required a certification prior to a return to work, attempted to determine if it could accommodate a restriction contained in the certification Plaintiff presented, and extended his leave when it was not able to do so. It even went one step further and attempted to find a position for him when he was able to return to work without restriction; unfortunately, there was no available position.

Second, the promises about which Plaintiff complains were all predictions of future actions, not statements of presently existing fact. Accordingly, Plaintiff cannot rely upon them as the basis for a fraud claim. Hale Trucks of Maryland, 224 F. Supp. 2d at 1032; Appel v. Hupfield, 198 Md. at 379, 84 A.2d at 96.

Third, there is no evidence that Quest knew or had reason to believe that any of the alleged statements were false, particularly at the time they were made, or that it made these statements with intend to defraud Plaintiff. Indeed, Quest had no way of knowing that Plaintiff would be unable to return to work without restrictions prior to the end of his FMLA leave.

Fourth, Claimant cannot show that he relied to his detriment on these statements. To the contrary, as already discussed, he admittedly would have had his surgery and gone on disability leave even without the benefit of FMLA, and still would have had the same restriction if he had sought to return to work at any time prior to May 2000. This is particularly true in light of the facts that these statements were only predictions of future events and that Plaintiff was an employee at will. See Adler v. American Std. Corp., 538 F. Supp. at 581 (questioning whether a plaintiff would ever be able to prove fraud and reliance to his detriment in an at-will situation, except in situations such as discrimination or abusive discharge, and also questioning ability to prove fraud based on an opinion).

Finally, with respect to being interviewed concerning the job for which he applied in May 2000, there is no evidence that Ms. Martin knew or had any reason to believe that anything she said about this position was false, much less that she made such statements with intent to defraud. To the contrary, Ms. Martin states that she was not involved in filling the position and was unaware that the posting for the position has already closed and that two individuals already had been interviewed. (Holthaus Dec. ¶ 14). Plaintiff himself admits that he has no evidence that Ms. Martin knew that he would not get an interview at the time that she told him that she thought he would get one. (Dep. 100:5-12.) In addition, there is nothing to suggest that Plaintiff detrimentally relied on her alleged statement. The mere fact that he applied for and did not get the job does not constitute any form of harm, particularly as he already knew that he had no current position with Quest and learned that the job was already filled within two days. Moreover, in light of Maryland's employment at will doctrine, any such reliance would not have been justified, as his employment (or any offer of employment) could have been terminated at any time. McNierney v. McGraw-Hill, 919 F. Supp. at 861.

Accordingly, Quest is also entitled to summary judgment on Plaintiff's Count V fraud claim.

## V.    __CONCLUSION__

For the reasons stated above, (1) Plaintiff cannot establish a violation of the FMLA and in any event his FMLA claim is time-barred; (2) Plaintiff's four common law claims are preempted by ERISA, and he cannot establish a claim under ERISA; and (3) Plaintiff cannot establish any of his common law claims. Accordingly, there are no genuine issues of material

fact to be tried and Defendant Quest Diagnostics Incorporated is entitled to judgment as a matter of law on all counts.

Respectfully submitted,


_____/s/_____
Frank C. Morris, Jr., Esq.
Bar No. 05157
Brian Steinbach, Esq.
Bar No. 024849
EPSTEIN BECKER & GREEN, P.C.
1227 25th Street, N.W., Suite 700
Washington, D.C. 20037
(202) 861-0900

Attorneys for Defendant
Quest Diagnostics Incorporated

Dated: September 23, 2003

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on September 23, 2003, a copy of Defendant's

Memorandum of Law in Support of Motion for Summary Judgment, together with supporting

material, was electronically filed and served on the following:

> J. Scott Morse, Esq.
> Law Office of J. Scott Morse, LLC
> 334 St. Paul Place
> Baltimore, MD 21202
>
> Attorneys for Plaintiff

> _____/s/_____
> Brian Steinbach, Esq.
> Bar No. 024849
> EPSTEIN BECKER & GREEN, P.C.
> 1227 25th Street, N.W., Suite 700
> Washington, D.C. 20037
> (202) 861-0900
> Fax: (202) 296-2882