**EXHIBIT A**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION

| | |
|---|---|
| **ANTHONY PASSAUER**<br>          **Plaintiff,**<br>   v.<br>**QUEST DIAGNOSTICS INCORPORATED,**<br>          **Defendant.** | Civil No.: CCB 03-CV-159 |

## DECLARATION OF MARILYN MARTIN HOLTHAUS

I, Marilyn Martin Holthaus, declare as follows:

1. I am currently a Human Resources Manager for the Baltimore, Maryland business unit of Quest Diagnostics Inc. ("Quest"). As such I am based at Quest's Baltimore, Maryland facility, also known as its Arbutus, Maryland location. My office is located on Sulphur Spring Road. The facts in this Declaration are based on personal knowledge.

2. In 2000, I was a Human Resources Generalist for Quest at the same location. At that time, I was known as Marilyn Martin. I have since married and changed my last name to Holthaus. I reported to Lynn Neidenbach, who was then the Director of Human Resources.

3. Quest is a Delaware corporation doing business at various locations throughout the United States, including Maryland.

4. At all pertinent times Quest's main Maryland office and laboratory was located on Sulphur Spring Road in Arbutus, Maryland, and it also operated a warehouse, facility located nearby on Caton Avenue, also in Arbutus.

5. Among other things, Quest provides diagnostic testing, information and services to doctors and hospitals. In the course of providing these services, it employs drivers who pick

up medical specimens for various physician offices and medical facilities and bring them to a terminal, from where the specimens are transferred to our laboratory on Sulphur Spring Road. The same drivers also deliver reports and supplies. In addition, Quest operates free-standing facilities at which diagnostic services are also provided. Quest's Caton Avenue warehouse, among other things, provides supplies to both its own facilities and to the various physician offices and medical facilities for which it provides services. In 2000 the Warehouse Manager was Larry Bauernshub. He left Quest in 2001.

6.  On August 16, 1999, Quest acquired the similar operations of SmithKline Beecham Clinical Laboratories ("SmithKline"). This included a warehouse located in Owings Mills, Maryland. Actual operations were integrated over a period of time. In the Baltimore business unit, this integration occurred in late December 1999 and early January 2000. The Owings Mills warehouse closed during the first quarter of 2000 and most of the employees accepted transferred to the Caton Avenue warehouse. This included Facilities Supervisor Sayed (Ali) Haghgoo.

7.  One of the benefits that Quest provides its employees is a Severance Plan. This is considered a "welfare plan" under ERISA. There are specific requirements for eligibility, for applying for benefits, for appealing a denied claim, and for filing suit. These are summarized in the "Other Benefits" and Administrative" sections of the Quest Benefits Handbook introduced in Mr. Passauer's deposition as Dep. Ex. 4, and set forth in detail in the actual Plan. A copy of the complete Plan as it existed in early 2000, including March through May 2000, is attached as Ex. 1.

8.      Quest's records show that it sent a letter dated January 17, 2000 to Mr. Passauer that, among other things, granted him leave under the Family and Medical Leave Act ("FMLA) and outlined Quest's policy and his obligations under the company's policy. Quest's records also show that he signed for receipt of that letter on January 19, 2000. A copy of this letter, with the signed receipt attached, was introduced in Mr. Passauer's deposition as Dep. Ex. 7 and is attached hereto as Ex. 2. This letter is signed by Mindy McNey, who was a Quest Human Resources Representative.

9.      On April 5, 2000 I received a return to work release, entitled Disability Certificate, that Anthony Passauer brought to the Sulphur Spring facility. This certificate, a copy of which is attached as Ex. 3, contained a thirty pound lifting restriction until May 1, 2000.

10.     After receiving the certificate, I conferred with Ms. Neidenbach concerning whether Quest could accommodate Mr. Passauer's restriction. She in turn spoke with Warehouse Manger Larry Bauernshub. She then informed me that Mr. Bauernshub had told her that he did not have any work in the warehouse that could accommodate Plaintiff's lifting restriction. She further informed me that, based on this information and her own knowledge of the physical requirements of the work in the warehouse, she had concluded that there were no jobs in the warehouse that did not involve lifting, and that a light duty restriction such as Mr. Passauer's could not be accommodated even for a few weeks, as there would be nothing for him to do. Accordingly, she informed me that the warehouse department could not accommodate Mr. Passauer's restrictions and that light duty was not an option, and that I should inform Mr. Passauer.

11. Later on April 5, I called Mr. Passauer at home to inform him of the company's decision, and left him a message on his answering machine. The transcript of Mr. Passauer's tape recording of my message, introduced in his deposition as Dep. Ex. 9, is substantially accurate.

12. I never received any return call from Mr. Passauer disputing Quest's position that the 30 pound lifting restriction constituted light duty or that Quest could not accommodate that restriction. I also never received any call from him indicating that he was trying to get another certificate without the lifting restriction.

13. Quest has a standard letter that it automatically sends out to employees on FMLA leave who have used up all of their FMLA leave. I have seen the letter dated April 19, 2000 to Mr. Passauer from Mindy McNey, introduced in Mr. Passauer's deposition as Dep. Ex. 10. This is the standard form letter used at that time.

14. On or about May 8, 2000, Mr. Passauer again came to the Sulphur Spring facility. When I met with him, he told me that he was ready to return to work. I recall that he had, or said he had, a new certificate without a lifting restriction. I confirmed that his former position was no longer available, but told him that he could apply for any open position. In particular, I suggested that he apply for a posted position as supervisor of logistics. He did so before leaving. As I was not involved in the hiring process for this position, I did not realize at the time that the posting period for the position had expired on May 3, and that both the ultimately successful candidate, Joseph Neuslein, and another candidate, Joseph Jones, both whom already worked in the logistics department and were former SmithKline employees, already had been interviewed.

4

15. On May 10, 2000 I learned from either Logistics Manager Phil Foster or Staffing Specialist Melkeya Lebron that Mr. Foster had decided to offer the supervisor position to Mr. Neuslein. Later that day, Mr. Passauer called me and asked about the position. I then told him that I had learned that it had been filled.

16. Insofar as Quest's records show, Mr. Passauer never applied for severance pay under the Quest Severance Plan, or filed an appeal of any alleged denial of benefits under the Plan.

17. During the period from July 11 through October 18, 2000, Quest received three letters from an attorney named Stephen Awalt threatening to file suit on Mr. Passauer's behalf. The last of these also included a draft complaint with an FMLA claim. Copies of these letters and the draft complaint are attached as Exs. 4 through 6.

18. On Tuesday, September 16, 2003 I learned that Larry Bauernshub died on Saturday, September 14, 2003. Attached as Ex. 7 is a copy of his obituary from the Baltimore Sun's website.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 23rd day of September, 2003 at Arbutus, Maryland.


/s/*
Marilyn Martin Holthaus

*Counsel hereby certifies that he has a signed copy of the foregoing document available for inspection at any time by the court or a party to this action.