**EXHIBIT 2**

Quest Diagnostics Inc.

1901 Sulphur Spring R
Baltimore, MD 21227
410.247.9100

**SENDER:**
- Complete items 1 and/or 2 for additional services.
- Complete items 3, 4a, and 4b.
- Print your name and address on the reverse of this form so that we can return this card to you.
- Attach this form to the front of the mailpiece, or on the back if space does not permit.
- Write *Return Receipt Requested* on the mailpiece below the article number.
- The Return Receipt will show to whom the article was delivered and the date delivered.

I also wish to receive the following services (for an extra fee):
1. ☐ Addressee's Address
2. ☐ Restricted Delivery
Consult postmaster for fee.

3. Article Addressed to:

Anthony R Passauer
1911 Middleborough
Baltimore, MD 21221

4a. Article Number
P 569 712 727

b. Service Type
☐ Registered        ☑ Certified
☐ Express Mail      ☐ Insured
☐ Return Receipt for Merchandise  ☐ COD

7. Date of Delivery
1/19

5. Received By: (Print Name)

8. Addressee's Address (Only if requested and fee is paid)

6. Signature: (Addressee or Agent)
X

PS Form 3811, December 1994    102595-98-B-0229    Domestic Return Receipt

01/17/00

REGULAR MAIL
CERTIFIED MAIL
RETURN RECEIPT REQUES

Anthony R Passauer
1911 Middleborough
Baltimore, MD 21221

Dear Anthony:

On 12/30/2000, you notified us of a situation that may make you eligible to take a leave under the Federal Family and Medical Leave Act (FMLA). Please refer to **"Your Benefits Handbook"**, section titled *"Other Benefits"* for more information regarding the Company's policy and your obligations under the policy.

**Amount of Leave**

As of this date, the maximum leave available for you is 12 weeks. This means that if you comply with the policy, and your condition continues to meet the requirements for leave under the FMLA, your FMLA leave could be certified through .

**Job Restoration**

Employees are generally reinstated to the same or equivalent job with the same pay, benefits, and terms and conditions of employment on your return from FMLA leave. In all circumstances, you will be treated in a fair and consistent manner, in accordance with the Company's policies. If you do not return to work following FMLA leave, or you fail to follow your obligations under the policy, there is no guarantee of job restoration.

If you have medical benefits through the Company, your coverage will continue during your FMLA leave under the same terms and conditions as if you were actively working. More detailed information regarding your medical benefits and other benefit continuation issues during your leave is provided below.

**Disability Benefits**

You advised us of an accident, condition or injury, which may be eligible for benefits under the Company's disability program. In order to be considered for those benefits, you must contact **Aetna Managed Disability** AS SOON AS POSSIBLE to initiate your claim. To do so, call **1-800-700-9954** and select **OPTION 2.** Failure to contact Aetna may jeopardize your eligibility for those benefits. You will be contacted for further information regarding disability benefits. Please note that the requirements of the disability program are different from the requirements of the FMLA leave.

**This is to inform you that:**

1.    The Company has tentatively designated your absence as FMLA leave. The leave starts on 01/18/2000 and continues until your health care provider releases you to return to work. (Maximum leave entitlement is twelve (12) weeks within a 12-month period.)

If you have applied for disability benefits under the Company's disability program <u>and</u> have received written notification from Aetna that your disability has been certified, you do not need to do anything further at this time regarding obtaining a Provider's Certification.

If you have not received written notification from Aetna that your claim has been certified, you **must** have your health care provider complete the attached Provider's Certification within fifteen calendar days of this letter, specifically 02/01/2000. If your disability leave is denied or delayed, you will <u>not</u> have any benefits under the FMLA if the Provider's Certification is not returned to the Company by the date specified above. Please refer to paragraph 3 below.

2.    The leave will be counted against your FMLA leave entitlement if the Provider's Certification is completed and returned in accordance with the requirements of the policy, or if Aetna confirms eligibility for the disability benefits.

3.    If you fail to return the Provider's Certification in accordance with the requirements of the policy, or Aetna does not certify your disability claim, the leave will not qualify as FMLA. In that event, the time taken will be treated as absences under the facility's policies, and could result in disciplinary action consistent with those policies.

4.    You may use any accrued leave entitlement (sick, free or vacation time) during unpaid FMLA leave, however, use of entitlement time cannot delay the commencement of your claim for disability benefits. You may supplement your disability benefits with entitlement time. If you are supplementing, you may not receive more than 100% of your salary. Your use of paid time off is limited to the amount of accrued unused leave entitlement you have on the date the leave begins. You will not accrue additional entitlement time during your leave.

5.    If the circumstances of your leave change and you are able to return to work earlier than the date indicated, you will be required to notify us at least 2 work days prior to the day you intend to report for work or immediately if released with less than 2 work days' notice.

6.    If Aetna has confirmed eligibility for the disability benefits and certified your claim, you will not be required to furnish any recertification while Aetna maintains that you are unable to return to work.

However, if Aetna determines that you are able to return to work and your health care provider disagrees, **and you have remaining FMLA entitlement**, your health care provider **must** complete the enclosed Provider's Certification within fifteen calendar days of Aetna's determination that you are able to return to work. If the Provider's Certification is not returned within that fifteen-day period, then the time taken will be treated as

absences under the facility's policies, and could result in disciplinary action consistent with those policies.

7.   You will be required to present a fitness-for-duty certificate prior to being restored to employment. If such certification is not received, your return to work may be delayed until the certification is provided. A fitness-for-duty certificate is a note from your health care provider or Aetna confirming that the condition set forth in the Provider's certification, or the condition reported to Aetna, has ended, and that you are able to return to work and perform the functions of your position.

8.   If the fitness-for-duty certification sets out any restrictions on your ability to perform the essential functions of your job, the Company will consider it a request for temporary accommodation and will work with you in an effort to accommodate you. Where your restrictions cannot be accommodated, the Company will consider other options, including requiring you to take additional leave or another open position.

9.   If the fitness-for-duty certification recommends a reduced or modified (part-time) schedule or intermittent leave, the Company will accommodate this request provided that it is medically necessary, the Company's business operations will not be unreasonably disrupted, and you have FMLA leave entitlement remaining. If the fitness-for-duty certification recommends a modified or reduced schedule, or intermittent leave, it is your obligation to schedule the leave with your manager and me so as not to disrupt the department's operations. We will work together to determine how the Company can schedule your leave.

Please note that the Company may require additional medical examinations and/or recertification to assist in determining the length and extent of any modified or reduced schedule, or the need for intermittent leave.

10.  If you do not report back to work on or before your expiration date or your release to return to work, if you accept other employment during your leave, participate in a personal business venture, file for unemployment benefits during this leave, or otherwise indicate that you will not return, the Company has a right to terminate your employment.

## Benefits During Leave

### 401(k) Plan

Deductions and/or contributions for the 401(k) and ESPP plans will stop during the period of time when you received no payroll payments from us.

### Health Coverage

If you are enrolled in a health plan, your health benefits will continue under the same terms and conditions as if you continued to work. You may, however, elect to terminate your health benefits during your leave and re-enroll within 31 days from your date of return to work. In such case, your coverage will be effective the date of your return to work. To terminate coverage, submit written notice of your election to terminate coverage during

your leave. Such notice should be addressed to Mindy McNey - Human Resources, and must be received within **two weeks** from the date your leave begins. Your failure to notify us of your election to terminate coverage will result in continuation of coverage during your leave. The portion of your health insurance premiums that you normally pay will continue during the period of your FMLA leave. If you are using paid time off during your FMLA leave, your deductions will come automatically out of your paycheck. If you are not using paid time off, you will need to make the following arrangements with me to pay for your premium:

(a)    ◆ Pay monthly installments while on your leave by personal, certified check or money order.

**Checks should be made payable and sent to:**
Quest Diagnostics Incorporated
1901 Sulphur Spring Road
Baltimore, Maryland 21227-2997
Attention: Mindy McNey - Human Resources

(b)    You have a minimum 30-day grace period in which to make premium payments. If payment is not made in a timely manner, your group health insurance will be canceled, but we will notify you in writing at least 15 days before the date that your health coverage will lapse.

## Supplemental Life Insurance

If you are enrolled in supplemental life insurance, you may elect to terminate your supplemental coverage during your leave. If you terminate coverage you must re-enroll within 31 days from the date of your return to work for coverage to be reinstated. If you elect to terminate coverage, you must provide written notice of your interest to cancel within **two weeks** from the date your leave begins. Your failure to notify us of an interest to terminate coverage will result in coverage continuing during your leave. To continue coverage during your leave, you must pay the employee portion of the supplemental life insurance while you are on FMLA leave on the same schedule and conditions as outlined in the **Health Coverage** section above. Your failure to continue contributions will result in termination of coverage.

## Flexible Spending Accounts

If you are enrolled in a Flexible Spending Account you may elect to terminate participation in the Plan during your leave. If you elect to terminate participation in the Plan, any expenses incurred after the date you are no longer participating will **NOT** be eligible for reimbursement and any account balances may be forfeited. If you elect to terminate participation during your leave and return to work in the same Plan Year, you may elect to re-enroll within 31 days from the date of your return to work. If you elect to terminate coverage, you must provide written notice of your interest to cancel within **two weeks** from the date your leave begins. Your failure to notify us of an interest to terminate

coverage will result in participation continuing during your leave. To continue participation you MUST continue to make payments to fund your account(s) on the same schedule and conditions as outlined in the **Health Coverage** section above. Your failure to continue contributions will result in termination of your participation in the Plan.

As always, if you have any questions, please call me at (410) 536-1329.

Sincerely,

Mindy McNey
Human Resources Representative

cc:     Bauernshub,Lawrence R
        Medical File

**EXHIBIT 3**

GEORGE T. LAZAR, M.D., F.A.C.S.

EASTERN PROFESSIONAL BLDG.
1050 OLD NORTH POINT ROAD
SUITE 101
BALTIMORE, MD 21224
(410) 282-7600

## DISABILITY CERTIFICATE

DATE _4-3-00_

TO WHOM IT MAY CONCERN:

I HEREBY CERTIFY THAT _Anthony Paasauer_

HAS BEEN UNDER MY PROFESSIONAL CARE, AND WAS:

☒ TOTALLY INCAPACITATED

☐ PARTIALLY INCAPACITATED

FROM: _4-3-00_   TO: _4-9-00_

REMARKS: _No work through above dates._
_REturn to work 4-10-00. No lifting_
_over 30 pounds until 5-1-00_

SIGNED

**EXHIBIT 4**

# JENKINS & AWALT

ATTORNEYS AT LAW

MERCANTILE BLDG.-SUITE 617

409 WASHINGTON AVENUE

TOWSON, MARYLAND 21204

J. CALVIN JENKINS, JR.

STEPHEN B. AWALT

MICHAEL J. GEIST

(410) 296-6822

800-834-8249 (MD. ONLY)

FAX (410) 296-0689

E-MAIL ADDRESS

SAWALT@AOL.COM

July 11, 2000

Mindy McNey, Human Resources Representative
Quest Diagnostic, Inc.
1901 Sulphur Spring Road
Baltimore, Maryland 21227

Re: Anthony Passauer

Dear Ms. McNey:

I represent Anthony Passauer in his claim against Quest Diagnostic arising out of his
termination from Quest. In this letter I will explain our claim and give Quest the opportunity to
correct the situation before litigation is necessary.

<u>Improper Termination of Anthony Passauer Upon His Return from Family Medical Leave</u>

As you know, Mr. Passauer has been an employee at Quest Diagnostic (formerly
SmithKlein, Beecham), since December 1974. In November 1999 a shoulder injury caused Mr.
Pausser to seek medical attention. He was advised by his doctor that surgery would be necessary
and time off from work was recommended. Mr. Passauer notified Quest about the situation in
late December 1999 and requested an extended leave. By letter dated January 17, 2000 (Exhibit
1) Quest acknowledged Mr. Passauer's request and advised him that they had "tentatively
designated your absence as FMLA leave and that the leave starts on 1/18/00 and continues until
your health care provider releases you to return to work." Mr. Passauer was advised that he was
entitled to a maximum of 12 weeks of leave if he complied with the leave policy and his
condition continued to meet the requirements of the Federal Family Medical Leave Act (FMLA).

In reference to Mr. Passauer's "Job Restoration" the January 17 letter also stated the
following:

> Employees are generally reinstated to the same or equivalent job
> with the same pay, benefits and terms and conditions of employment
> on your return from FMLA leave. In all circumstances, you will
> be treated in a fair and consistent manner, in accordance with the
> Company's policies. If you do not return to work following FMLA

# JENKINS & AWALT

Mindy McNey
Re: Anthony Passauer
July 11, 2000
Page 2

leave, or you fail to follow your obligations under the policy, there
is no guarantee of job restoration.

During his leave Mr. Passauer complied with all of the obligations required of him under
the FMLA and Company policy. On April 5, 2000 Mr. Passauer reported to Quest supervisors to
advise them that he would be ready, willing and able to return to work on April 10, 2000 prior to
the 12 weeks granted him under the FMLA. At this time he also presented Quest with a "fitness-
for-duty certificate" (Exhibit 2) from his doctor as required by Company policy. The certificate
stated that Mr. Passauer could return to work as of April 10, 2000 and that he was not to lift over
30 pounds until May 1, 2000.

In his position as a "Job Coordinator" Mr. Passauer primarily worked at the supervisory
level. His essential job duties included, among other things, checking inventory, printing
requisitions, ordering and receiving supplies and coordinating the work of other warehouse
employees. In the performance of these duties it was normally not necessary for Mr. Passauer to
lift more then 30 lbs therefore the limitations placed on him by his doctor would not have
significantly effected his essential job performance. Regardless of his readiness and willingness
to work and his ability to perform all essential job functions however, Mr. Passauer was
informed, via a message left on his answering machine, that there were no "light duty" jobs for
him and that he should not return until he was "100%" (ie: after May 1, 2000).

Even assuming, for the sake of argument, that Mr. Passauer was unable able to perform
100% of his job duties his treatment by the company was in direct contrast to the information
given to him in the January 17, 2000 letter. The letter not only stated that "In all circumstances,
you will be treated in a fair and consistent manner..." it also stated the following:

> If the fitness-for-duty certification sets out any restrictions
> on your ability to perform the essential functions of your job,
> the Company will consider it a request for temporary
> accommodations and will work with you in an effort to
> accommodate you. Where your restrictions cannot be
> accommodated, the Company will consider other options,
> including requiring you to take additional leave or another
> open position.

Again, even assuming that Mr. Passauer required any accommodations, which he did not,
none were provided for him as promised in Quest's previous letter to him. Quest apparently did
nothing to investigate other positions or options. Therefore, since Quest was unwilling to return
Mr. Passauer to his former position, was unwilling to accommodate him and was unwilling to

**JENKINS & AWALT**

Mindy McNey
Re: Anthony Passauer
July 11, 2000
Page 3

provide any other position for him, he did as he was instructed to do and remained off work until May 1, 2000.

Shortly after being told not to return to work until he was 100% recovered, Mr. Passauer received a second letter from Quest dated April 19, 2000 (Exhibit 3). The letter's introductory paragraph stated the following:

> ...you have been on a leave of absence from the Company since 1/18/00. Your leave was covered under our Family and Medical Leave Act policy and was designated as FMLA. Your FMLA leave has expired or will expire on 4/11/00, and as a result you no longer have the job restoration rights provided under the FMLA.

Upon reaching 100% medical clearance during the first week of May 2000, Mr. Passauer again reported to Quest ready and willing to resume his job or an equivalent job as required by the FMLA. He was advised that neither his old job nor any equivalent job was available and that perhaps he should apply for another position with the Company. This certainly was not the fair and consistent treatment promised by Quest nor is Quest's action in accordance with the FMLA.

The Family Medical Leave Act of 1993 ("FMLA" or "Act") is codified in the United States Code at 29 USC § 2601 et seq. and in the Code of Federal Regulations at 29 CFR 825.100.[1] The Act allows eligible employees to take job-protected unpaid leave for up to a total of 12 workweeks in any 12 month period. *100(a)*. The Act is intended to allow employees to balance their work and family life by taking reasonable unpaid leave for medical and other family related reasons in a way that promotes the stability and economic interest of the family. *101(a)*. According to the Act, when an employee returns from FMLA leave, he or she is entitled to be returned to the same position the employee held when leave commenced, or to an equivalent position with equivalent pay, benefits and other terms and conditions of employment. *214(a)*. An employee is entitled to such reinstatement even if the employee has been replaced or his or her position has been restructured to accommodate the employee's absence. *Id.*

If the employee's original worksite has been closed, the employee is entitled to the same rights as if the employee had not been on leave when the worksite closed. *215(e)(1)*. For example, if an employer transfers all employees from a closed worksite to a new worksite in a

---

[1] Unless otherwise specified all subsection references are to FMLA 29 CFR 825.---.

## JENKINS & AWALT

Mindy McNey
Re: Anthony Passauer
July 11, 2000
Page 4

different location, the employee on leave is also entitled to transfer under the same conditions as if he or she had continued to be employed. *Id.* If an employer fails to restore an employee to his or her position upon return the employer must be able to show that the employee would not otherwise have been employed if leave had not been taken. *312(d).* In other words the burden of proving that the employee would no longer have a job with the company, regardless of the leave taken, is on the employer.

As a condition of restoring an employee whose FMLA leave was occasioned by the employee's own serious health condition an employer may have a policy that requires all similarly-situated employees to obtain and present certification from the employee's health care provider that the employee is able to resume work. *310(a)* The certification itself need only be a simple statement of an employee's ability to return to work. *310(c).* The employer may, with the employee's permission, contact the employee's health care provider for purposes of clarification of the employee's fitness to return to work but the employer may not delay the employee's return to work while contact with the health care provider is being made. *Id.*

If an employee's rights under the FMLA have been violated he or she may file a private law suit. *400(a)(2).* When the employer is found in violation the employee may recover wages, employment benefits, or other compensation denied or lost to such employee by reason of the violation as well as interest on such sum, calculated at the prevailing rate. *400(c).* In addition to any judgment awarded by the court the employee may also recover reasonable attorney fees, reasonable expert fees, and other costs of the action from the employer. *Id.*

### Conclusion

Mr. Passuer did everything that was required of him under the FMLA and Company policy. He requested and was granted FMLA leave. He reported to Quest ready, willing and able to work prior to the expiration of his FMLA leave. He presented Quest with a "fitness-for-duty" certificate from his doctor. Quest made no attempt to return him to his old job, accommodate him, or find him an alternative position with the Company. In communications with him, Quest stated that Mr. Passauer's temporary 30 lb. lifting limitation was the reason for extending his leave. Based upon Mr Passauer's position as a "Job Coordinator" however, his limitation would not have affected his ability to perform the essential functions of his job. Assuming that Quest did have legitimate concerns about Mr. Passauer's ability to perform his job Quest could have contacted Mr. Passauer's health care provider for clarification of his fitness to return to work. No such contact to Mr. Passauer's treating doctor was ever attempted. Instead Quest choose to terminate Mr. Passauer, without any severance pay, after 25 years of employment with the Company.

# JENKINS & AWALT

Mindy McNey
Re: Anthony Passauer
July 11, 2000
Page 5

Mr. Passauer has been through an immense amount of financial difficulty as a direct result of Quest's actions and ultimate decision to terminate him. Quest failed to properly investigate Mr. Passauer's job duties to determine if his temporary limitations prevented him from performing his essential job functions. Quest failed to contact Mr. Passauer's health care provider for any clarification as to his limitations. Quest failed to accommodate Mr. Passauer in any way. These and other failures by Quest led to Mr. Passauer's termination from the Company after 25 years of service and also wrongfully excluded him from receiving any severance pay. In addition Mr. Passauer, as a result of his unemployment, has been unable to maintain the medical benefits that he and his family were entitled to under Quest's health care plan. At minimum Mr. Passauer is entitled to receive the 52 week severance plan which he has earned, by way of 25 plus years of service with the Company, and is entitled to continuation of his health coverage benefits, or their equivalent dollar amount, (approximately $500 per month under COBRA), for the reasonable period of time it takes to secure new employment. The total damage estimate at this time is $50,000,00. As indicated earlier in this letter, if this matter is not resolved, Mr. Passauer will be seeking every available legal remedy which may include attorney's fees, expert fees, court costs, interest and other penalties. I ask for your immediate attention to this matter.

Very truly yours,

Stephen B. Awalt

SBA:ejm
Enclosures
cc: Anthony Passauer

**EXHIBIT 5**

# JENKINS & AWALT

### ATTORNEYS AT LAW

MERCANTILE BLDG.-SUITE 617

409 WASHINGTON AVENUE

## TOWSON, MARYLAND 21204

J. CALVIN JENKINS, JR.

STEPHEN B. AWALT

MICHAEL J. GEIST

(410) 296-6822

800-834-8249 (MD. ONLY)

FAX (410) 296-0689

E-MAIL ADDRESS

SAWALT@AOL.COM

August 18, 2000

Mindy McNey, Human Resources Representative
Quest Diagnostic, Inc.
1901 Sulphur Spring Road
Baltimore, Maryland 21227

Re: Anthony Passauer

Dear Ms. McNey:

I represent Anthony Passauer in his claim against Quest Diagnostic arising out of his termination from Quest. Enclosed you will find a copy of the letter I sent to you on July 11, 2000. The purpose of this letter was to detail my client's claim against Quest and to provide Quest with the opportunity to correct the situation without the need for litigation. To date I have received no response to my July 11, 2000 letter.

If you do not respond within ten (10) days from the date of this letter I will assume that Quest has no intention of settling this matter and will therefore proceed to file suit. If you should have any questions or if you wish to discuss this matter further please contact me immediately.

Very truly yours,

Stephen B. Awalt

SBA:ejm
Enclosure
cc: Anthony Passauer

# JENKINS & AWALT

### ATTORNEYS AT LAW
MERCANTILE BLDG.·SUITE 617
409 WASHINGTON AVENUE
TOWSON, MARYLAND 21204

J. CALVIN JENKINS, JR.
STEPHEN B. AWALT

MICHAEL J. GEIST

(410) 296-6822
800-834-8249 (MD. ONLY)
FAX (410) 296-0689

E-MAIL ADDRESS
SAWALT@AOL.COM

July 11, 2000

Mindy McNey, Human Resources Representative
Quest Diagnostic, Inc.
1901 Sulphur Spring Road
Baltimore, Maryland 21227

Re: Anthony Passauer

Dear Ms. McNey:

I represent Anthony Passauer in his claim against Quest Diagnostic arising out of his termination from Quest. In this letter I will explain our claim and give Quest the opportunity to correct the situation before litigation is necessary.

## Improper Termination of Anthony Passauer Upon His Return from Family Medical Leave

As you know, Mr. Passauer has been an employee at Quest Diagnostic (formerly SmithKlein, Beecham), since December 1974. In November 1999 a shoulder injury caused Mr. Pausser to seek medical attention. He was advised by his doctor that surgery would be necessary and time off from work was recommended. Mr. Passauer notified Quest about the situation in late December 1999 and requested an extended leave. By letter dated January 17, 2000 (Exhibit 1) Quest acknowledged Mr. Passauer's request and advised him that they had "tentatively designated your absence as FMLA leave and that the leave starts on 1/18/00 and continues until your health care provider releases you to return to work." Mr. Passauer was advised that he was entitled to a maximum of 12 weeks of leave if he complied with the leave policy and his condition continued to meet the requirements of the Federal Family Medical Leave Act (FMLA).

In reference to Mr. Passauer's "Job Restoration" the January 17 letter also stated the following:

> Employees are generally reinstated to the same or equivalent job with the same pay, benefits and terms and conditions of employment on your return from FMLA leave. In all circumstances, you will be treated in a fair and consistent manner, in accordance with the Company's policies. If you do not return to work following FMLA

JENKINS & AWALT

Mindy McNey
Re: Anthony Passauer
July 11, 2000
Page 2

leave, or you fail to follow your obligations under the policy, there
is no guarantee of job restoration.

During his leave Mr. Passauer complied with all of the obligations required of him under
the FMLA and Company policy. On April 5, 2000 Mr. Passauer reported to Quest supervisors to
advise them that he would be ready, willing and able to return to work on April 10, 2000 prior to
the 12 weeks granted him under the FMLA. At this time he also presented Quest with a "fitness-
for-duty certificate" (Exhibit 2) from his doctor as required by Company policy. The certificate
stated that Mr. Passauer could return to work as of April 10, 2000 and that he was not to lift over
30 pounds until May 1, 2000.

In his position as a "Job Coordinator" Mr. Passauer primarily worked at the supervisory
level. His essential job duties included, among other things, checking inventory, printing
requisitions, ordering and receiving supplies and coordinating the work of other warehouse
employees. In the performance of these duties it was normally not necessary for Mr. Passauer to
lift more then 30 lbs therefore the limitations placed on him by his doctor would not have
significantly effected his essential job performance. Regardless of his readiness and willingness
to work and his ability to perform all essential job functions however, Mr. Passauer was
informed, via a message left on his answering machine, that there were no "light duty" jobs for
him and that he should not return until he was "100%" (ie: after May 1, 2000).

Even assuming, for the sake of argument, that Mr. Passauer was unable able to perform
100% of his job duties his treatment by the company was in direct contrast to the information
given to him in the January 17, 2000 letter. The letter not only stated that "In all circumstances,
you will be treated in a fair and consistent manner..." it also stated the following:

>    If the fitness-for-duty certification sets out any restrictions
>    on your ability to perform the essential functions of your job,
>    the Company will consider it a request for temporary
>    accommodations and will work with you in an effort to
>    accommodate you. Where your restrictions cannot be
>    accommodated, the Company will consider other options,
>    including requiring you to take additional leave or another
>    open position.

Again, even assuming that Mr. Passauer required any accommodations, which he did not,
none were provided for him as promised in Quest's previous letter to him. Quest apparently did
nothing to investigate other positions or options. Therefore, since Quest was unwilling to return
Mr. Passauer to his former position, was unwilling to accommodate him and was unwilling to

JENKINS & AWALT

Mindy McNey
Re: Anthony Passauer
July 11, 2000
Page 3

provide any other position for him, he did as he was instructed to do and remained off work until May 1, 2000.

Shortly after being told not to return to work until he was 100% recovered, Mr. Passauer received a second letter from Quest dated April 19, 2000 (Exhibit 3). The letter's introductory paragraph stated the following:

> ...you have been on a leave of absence from the Company since 1/18/00. Your leave was covered under our Family and Medical Leave Act policy and was designated as FMLA. Your FMLA leave has expired or will expire on 4/11/00, and as a result you no longer have the job restoration rights provided under the FMLA.

Upon reaching 100% medical clearance during the first week of May 2000, Mr. Passauer again reported to Quest ready and willing to resume his job or an equivalent job as required by the FMLA. He was advised that neither his old job nor any equivalent job was available and that perhaps he should apply for another position with the Company. This certainly was not the fair and consistent treatment promised by Quest nor is Quest's action in accordance with the FMLA.

The Family Medical Leave Act of 1993 ("FMLA" or "Act") is codified in the United States Code at 29 USC § 2601 et seq. and in the Code of Federal Regulations at 29 CFR 825.100.[1] The Act allows eligible employees to take job-protected unpaid leave for up to a total of 12 workweeks in any 12 month period. *100(a)*. The Act is intended to allow employees to balance their work and family life by taking reasonable unpaid leave for medical and other family related reasons in a way that promotes the stability and economic interest of the family. *101(a)*. According to the Act, when an employee returns from FMLA leave, he or she is entitled to be returned to the same position the employee held when leave commenced, or to an equivalent position with equivalent pay, benefits and other terms and conditions of employment. *214(a)*. An employee is entitled to such reinstatement even if the employee has been replaced or his or her position has been restructured to accommodate the employee's absence. *Id.*

If the employee's original worksite has been closed, the employee is entitled to the same rights as if the employee had not been on leave when the worksite closed. *215(e)(1)*. For example, if an employer transfers all employees from a closed worksite to a new worksite in a

---

[1] Unless otherwise specified all subsection references are to FMLA 29 CFR 825.----.

JENKINS & AWALT

Mindy McNey
Re: Anthony Passauer
July 11, 2000
Page 4

different location, the employee on leave is also entitled to transfer under the same conditions as if he or she had continued to be employed. *Id.* If an employer fails to restore an employee to his or her position upon return the employer must be able to show that the employee would not otherwise have been employed if leave had not been taken. *312(d)*. In other words the burden of proving that the employee would no longer have a job with the company, regardless of the leave taken, is on the employer.

As a condition of restoring an employee whose FMLA leave was occasioned by the employee's own serious health condition an employer may have a policy that requires all similarly-situated employees to obtain and present certification from the employee's health care provider that the employee is able to resume work. *310(a)* The certification itself need only be a simple statement of an employee's ability to return to work. *310(c)*. The employer may, with the employee's permission, contact the employee's health care provider for purposes of clarification of the employee's fitness to return to work but the employer may not delay the employee's return to work while contact with the health care provider is being made. *Id.*

If an employee's rights under the FMLA have been violated he or she may file a private law suit. *400(a)(2)*. When the employer is found in violation the employee may recover wages, employment benefits, or other compensation denied or lost to such employee by reason of the violation as well as interest on such sum, calculated at the prevailing rate. *400(c)*. In addition to any judgment awarded by the court the employee may also recover reasonable attorney fees, reasonable expert fees, and other costs of the action from the employer. *Id.*

<u>Conclusion</u>

Mr. Passuer did everything that was required of him under the FMLA and Company policy. He requested and was granted FMLA leave. He reported to Quest ready, willing and able to work prior to the expiration of his FMLA leave. He presented Quest with a "fitness-for-duty" certificate from his doctor. Quest made no attempt to return him to his old job, accommodate him, or find him an alternative position with the Company. In communications with him, Quest stated that Mr. Passauer's temporary 30 lb. lifting limitation was the reason for extending his leave. Based upon Mr Passauer's position as a "Job Coordinator" however, his limitation would not have affected his ability to perform the essential functions of his job. Assuming that Quest did have legitimate concerns about Mr. Passauer's ability to perform his job Quest could have contacted Mr. Passauer's health care provider for clarification of his fitness to return to work. No such contact to Mr. Passauer's treating doctor was ever attempted. Instead Quest choose to terminate Mr. Passauer, without any severance pay, after 25 years of employment with the Company.

# JENKINS & AWALT

Mindy McNey
Re: Anthony Passauer
July 11, 2000
Page 5

Mr. Passauer has been through an immense amount of financial difficulty as a direct result of Quest's actions and ultimate decision to terminate him. Quest failed to properly investigate Mr. Passauer's job duties to determine if his temporary limitations prevented him from performing his essential job functions. Quest failed to contact Mr. Passauer's health care provider for any clarification as to his limitations. Quest failed to accommodate Mr. Passauer in any way. These and other failures by Quest led to Mr. Passauer's termination from the Company after 25 years of service and also wrongfully excluded him from receiving any severance pay. In addition Mr. Passauer, as a result of his unemployment, has been unable to maintain the medical benefits that he and his family were entitled to under Quest's health care plan. At minimum Mr. Passauer is entitled to receive the 52 week severance plan which he has earned, by way of 25 plus years of service with the Company, and is entitled to continuation of his health coverage benefits, or their equivalent dollar amount, (approximately $500 per month under COBRA), for the reasonable period of time it takes to secure new employment. The total damage estimate at this time is $50,000.00. As indicated earlier in this letter, if this matter is not resolved, Mr. Passauer will be seeking every available legal remedy which may include attorney's fees, expert fees, court costs, interest and other penalties. I ask for your immediate attention to this matter.

Very truly yours,

Stephen B. Awalt

SBA:ejm
Enclosures
cc: Anthony Passauer

**EXHIBIT 6**

# JENKINS & AWALT

ATTORNEYS AT LAW

MERCANTILE BLDG.-SUITE 617

409 WASHINGTON AVENUE

TOWSON, MARYLAND 21204

J. CALVIN JENKINS, JR.

STEPHEN B. AWALT

MICHAEL J. GEIST

———————

(410) 296-6822

800-834-8249 (MD. ONLY)

FAX (410) 296-0689

E-MAIL ADDRESS

SAWALT@AOL.COM

October 18, 2000

Mindy McNey, Human Resources Representative
Quest Diagnostic, Inc.
1901 Sulphur Spring Road
Baltimore, Maryland 21227

Re: Anthony Passauer

Dear Ms. McNey:

Your failure to respond to either of my two previous letters, dated July 11, 2000 and August 18, 2000, leads me to conclude that Quest Diagnostic, Inc. has no intention of settling this matter. Accordingly, I will be filing suit in this matter no than later than November 2, 2000. I have enclosed a copy of the suit for your review.

If you should have any questions or wish to discuss this matter please contact me immediately.

Very truly yours,

Stephen B. Awalt

Stephen B. Awalt

SBA:ejm
cc:    Anthony Passauer
       Anthony DiPaula, Esq.

| ANTHONY PASSAUER | * | IN THE |
| 1911 Middlebrough Road | | |
| Baltimore, Maryland 21221 | * | CIRCUIT COURT |
| | | |
| Plaintiff | * | FOR |
| | | |
| v. | * | BALTIMORE COUNTY |
| | | |
| QUEST DIAGNOSTICS, INC. | * | |
| 1901 Sulphur Spring Road | | |
| Baltimore, Maryland 21227 | * | Case No. |
| | | |
| Defendant | * | |

\* \* \* \* \* \* \* \* \* \* \* \*

## COMPLAINT

Anthony Passauer, Plaintiff, by his attorney, Stephen B. Awalt, Jenkins & Awalt, respectfully represents unto this Court that:

## I. JURISDICTION

1. Plaintiff at all times pertinent to this action has resided in Baltimore County, Maryland.

2. Defendant at all time pertinent to this action has been a corporation doing business in Baltimore County, Maryland.

3. The court has jurisdiction over this matter under 29 USCA § 2617(a)(2).

## II. FACTS OF THE COMPLAINT

4. Plaintiff adopts by reference the allegations contained in paragraphs 1 through 3 of this Complaint with the same effect as if herein fully set forth.

5. Plaintiff was an employee of Defendant working as a "Job Coordinator", having been hired in December, 1974.

6. Due to a shoulder injury which required surgery and time for recovery Plaintiff requested from Defendant a leave of absence from his job in December 1999.

7. In a letter dated January 17, 2000 (copy attached as exhibit 1) Defendant notified Plaintiff that Plaintiff's request for leave was granted, and that the leave was to begin on January 18, 2000. This leave was designated as Family and Medical Leave

JENKINS & AWALT
TOWSON MD 21204

pursuant to Defendant's company policy and the Family and Medical Leave Act (FMLA). Plaintiff was advised by the Defendant that upon return from leave "[e]mployees are generally reinstated to the same or equivalent job with the same pay, benefits, and terms and conditions of employment."

8.  Additionally, in its January 17, 2000 letter, Defendant also advised Plaintiff that he would be required to present a fitness-for-duty certificate from his doctor and that "if the certificate sets out any restrictions on ability to perform the essential functions of your job, the Company will consider it a request for temporary accommodation and will work with you in an effort to accommodate you. Where your restrictions cannot be accommodated, the Company will consider other options, including requiring you to take additional leave or another open position."

9.  On or about April 5, 2000, Plaintiff advised Defendant that he would be ready willing and able to return to work on April 10, 2000, (prior to the full 12 weeks granted to him under the FMLA). Also at this time, Plaintiff presented Defendant with a fitness-for-duty certificate from Plaintiff's doctor (copy attached as exhibit 2). The certificate stated that Plaintiff could return to work as of April 10, 2000, and that he was not to lift over 30 lbs until May 1, 2000.

10.  In his position as a "Job Coordinator" Plaintiff primarily worked at the supervisory level. In the performance of his duties it was normally not necessary for Plaintiff to lift more than 30 lbs and therefore the temporary 30 lb lifting restriction placed on Plaintiff by his doctor would not have affected his essential job functions.

11.  Defendant never requested that Plaintiff obtain the opinion of a second health care provider nor did Defendant ever contact Plaintiff's doctor to question or clarify the temporary lifting limitation placed on Plaintiff.

12.  Despite Plaintiff's ability to return to work, and notwithstanding Defendant's policy of providing modified and/or transitional work assignments to its employees based on medical need, the Defendant made no attempt to return Plaintiff to his old job, to provide him with temporary accommodations, or find him an alternative position with the Company. Instead, Defendant informed Plaintiff that he was not to return to work until he was "100%" (i.e. on or after May 1, 2000).

13.  Having been told by agents of the Defendant that he was not allowed to return to his job and expecting to be returned to his job on May 1, 2000, Plaintiff did as the Defendant instructed him to do and returned home to wait.

14.  In a second letter dated April 19, 2000, however, (copy attached as exhibit 3), Defendant advised Plaintiff that Plaintiff's FMLA leave had expired and therefore Plaintiff no longer had any job restoration rights provided under the FMLA.

15.  Plaintiff attempted to report to work during the first week of May 2000, but was advised by agents for Defendant that neither his old job nor any equivalent job was

available for him.

### III.  VIOLATION OF STATUTE

16.  Plaintiff adopts by reference the allegations contained in paragraphs 1 through 15 of this Complaint with the same effect as if herein fully set forth.

17.  Defendant is a private sector employer who employs 50 or more employees for at least 20 work weeks in the current or proceeding calendar year.

18.  Plaintiff worked for Defendant, a covered employer.

19.  Plaintiff had worked for Defendant for at least 12 months prior to taking FMLA leave in January 2000.

20.  Plaintiff had worked at least 1250 hours over the 12 month period prior to taking FMLA leave in January 2000.

21.  Plaintiff worked at a location where at least 50 employees were employed by Defendant within 75 miles.

22.  Plaintiff was entitled to take reasonable leave, not to exceed a total of 12 workweeks of leave during any 12 month period, when the Plaintiff's own serious health condition made the Plaintiff unable to perform the functions of his job.

23.  Plaintiff returned to work as soon as he was well and gave Defendant written verification from Dr. George T. Lazar of Plaintiff's medical clearance to return to work.

24.  Plaintiff returned to work prior to the end of the 12 week period but was nonetheless terminated by defendant from his job in violation of the FMLA and Company policy.

25.  As a result of Defendant's violation of the statute, Plaintiff incurred damages.

### IV.  NEGLIGENT MISREPRESENTATION

26.  Plaintiff adopts by reference the allegations contained in paragraphs 1 through 25 of this Complaint with the same effect as if herein fully set forth.

27.  Defendant had a duty of care to Plaintiff. This duty required the transmittal of accurate information from Defendant to Plaintiff. The statements by agents of the Defendant to Plaintiff that Plaintiff would be reinstated upon his return from FMLA leave to the same or equivalent job with the same pay, benefits, and terms and conditions of employment were false. The statements by agents of the Defendant to Plaintiff that the Defendant would work with the Plaintiff in an effort to accommodate any restrictions on Plaintiff's ability to perform the essential functions of his job were false.

28. Defendant's negligent assertion of false statements, both written and verbal, made during the time of Plaintiff's leave, led Plaintiff to believe that he (Plaintiff) would be returned to work post-recovery.

29. After Defendant refused Plaintiff's request to return to work on April 10, 2000 Defendant negligently failed to advise Plaintiff that failure to return would lead to termination of duty and loss of severance pay (approximately $50,000).

30. As a result of the conduct of negligent misrepresentations by Defendant, Plaintiff incurred damages.

## V. PROMISSORY ESTOPPEL / DETRIMENTAL RELIANCE

31. Plaintiff adopts by reference the allegations contained in paragraphs 1 through 30 of this Complaint with the same effect as if herein fully set forth.

32. Defendant assured Plaintiff that upon Plaintiff's return from FMLA leave that he (Plaintiff) would be reinstated to his same or similar position or in the alternative that Defendant would attempt to accommodate any restrictions on Plaintiff's ability to perform the essential functions of his job.

33. In reliance upon Defendant's assurance of job restoration or its equivalent Plaintiff took a leave of absence from work to undertake treatment of a serious health condition that was preventing Plaintiff from performing the functions of his job.

34. Despite Defendant's assurances and Plaintiff's reliance on those assurances Defendant failed to restore Plaintiff to his former or equivalent position and failed to work with Plaintiff in an effort to accommodate any temporary restrictions placed on Plaintiff by his doctor.

35. As a result of Defendant's failure to restore Plaintiff to his former position or work with Plaintiff to accommodate any of Plaintiff's temporary restrictions, Plaintiff has suffered damages.

WHEREFORE, Plaintiff respectfully requests this court to grant the following relief:

A. Award Plaintiff damages against defendant in an amount equal to any wages, salary, employment benefits, and other compensation denied or lost to plaintiff by reason of the Defendant's actions;

B. Award Plaintiff interest on the amount of any wages, salary, employment benefits and other compensation denied or lost to the Plaintiff by reason of the Defendant's actions;

C. Award Plaintiff an additional amount as liquidated damages equal to the sum of the amount of any wages, salary, employment benefits, and other compensation denied

or lost to plaintiff and the interest on that amount;

D. Award Plaintiff such equitable relief as may be appropriate, including employment, reinstatement, and promotion;

E. Award Plaintiff reasonable attorney's fees, reasonable expert witness fees, and other costs of the action;

F. Grant Plaintiff such other and further relief as the court deems appropriate under the circumstances.

Respectfully submitted,

Dated: _____.

_____
Stephen B. Awalt
Jenkins & Awalt
409 Washington Avenue, Suite 617
Towson, Maryland 21204
(410) 296-6822
Attorney for Plaintiff, Anthony Passauer

**EXHIBIT 7**

**Lawrence R. Bauernshub**

On September 12, 2003, LAWRENCE R., of Sykesville; beloved son of the late Andrew and Dorothy Seipp Bauershub; loving husband of Joann M. Bauernshub; devoted father of Denise Chieppor, Chris Bauernshub and Brad Bauernshub; sisters Leola Peltzer, Cis Hennegan, and Annette Simmons; brother of Michael Bauernfiend; grandfather of Jillian, Jonathan, Peter, Drew, Zack, and Molly; and uncle of twelve nieces and four nephews. Funeral Services will be held on Tuesday, at 2:00 P.M., at Pritts Funeral Home & Chapel, 412 Washington Rd., Westminster. Interment will be private. The family will receive friends at the funeral home, on Sunday, from 6 to 9 P.M., and on Monday, from 2 to 4 and 7 to 9 P.M. In lieu of flowers, memorial contributions may be made in his name to the Nick Eric Wichman Foundation, 5179 Talbots Landing, Ellicott City, MD 21043 or to the Andrew Haab Memorial Fund, C/O Denise Chieppor, 389 Barley Dr., Lititz, PA 17543.
Published in the Baltimore Sun on 9/14/2003.

Back